[Civ. No. 19092.    First Dist., Div. Two.    Jan. 23, 1961.]

BLACK POINT AGGREGATES, INC. (a Corporation), Respondent, v. NILES SAND AND GRAVEL COMPANY, INC. (a Corporation) et al., Appellants.

Rhodes & Sabraw, Fred E. Avera and Rhodes, Sabraw & Avera for Appellants.

Allan, Miller, Groezinger, Keesling & Martin, Robert Metcalf Jones and Lemuel H. Matthews for Respondent.

DRAPER, J.—The complaint in this action for declaratory relief sought determination of the date when interest began to run on unpaid balances due under written agreement between the parties. However, defendants, by answer and cross-complaint, asserted that the contracts were in violation of the Corporate Securities Act, and this issue consumed the major portion of trial time. Judgment was for plaintiff on both complaint and cross-complaint, and defendants appeal. The issue of illegality is determinative.

In 1951, the Commissioner of Corporations authorized issue of plaintiff corporation's stock, but expressly conditioned his permit upon escrow of the share certificates. The permit provided that stockholders should not "consummate a sale or transfer of said shares or any interest therein, or receive any

consideration therefor, until the written consent'' of the commissioner had been obtained. This escrow requirement has not been modified.

In 1954, plaintiff corporation was in financial difficulties, and sought to extricate itself therefrom through some arrangement with defendants. In the course of their negotiations, the parties became concerned with securing a ''tax advantage,'' at least to defendant. There is strong indication that here, as so often occurs, the glittering possibility of outwitting the Director of Internal Revenue blinded the parties to obvious defects in other elements of their agreements.

Four written agreements are involved. In one, dated October 4, 1954, plaintiff agreed to sublease to defendants the property from which plaintiff was removing sand and gravel, and to lease to defendants plaintiff's plant and equipment. Plaintiff also agreed to deposit in escrow stock certificates representing at least 80 per cent of its outstanding capital stock, such certificates to be ''duly endorsed in blank by the owners thereof,'' and not to change its capital structure or to sell any more stock except to defendants. Defendants agreed to pay the outstanding liabilities of plaintiff, to install additional equipment, to pay rentals accruing to the lessor of the land, and to pay plaintiff ''rentals'' based on production and increasing both in rate and annual minimum over a period of four years, and thereafter to pay such royalties at the fourth year rate ''until the shareholders of record have received . . . a total sum representing 120% of the par value of outstanding shares . . .'' with a condition that ''full payment'' must be made within 10 years from date of agreement. Defendants were required to execute a mortgage to plaintiff of all equipment installed by defendants, which was to be surrendered ''when all obligations of [defendants] have been performed.'' The agreement also provided that in the event of default by defendants their rights should cease and escrow holder ''shall then deliver any and all certificates he then holds to the record owners thereof.''

A supplement was executed November 8. It provides that when 120 per cent of par value of plaintiff's stock shall have been paid to ''the shareholders'' of plaintiff by defendants, the parties will join in instructions to terminate the escrow. If the stock of plaintiff is then ''free of escrow requirements'' of the Commissioner of Corporations, the escrow holder shall deliver the endorsed stock certificates to defendants, and plain-

tiff will transfer the stock to defendants on its corporate records. If the stock is still subject to escrow under the commissioner's order, plaintiff shall "immediately prepare and file application with the [commissioner] requesting transfer of the endorsed outstanding shares" to defendants. No provision is made for the situation which would arise if the commissioner's escrow order continued in effect and he refused to approve the transfer. However, wholly separately from the two provisions above summarized, plaintiff agrees "to take such action as may be necessary or advisable to effect transfer" of the shares of plaintiff to defendants. This agreement also provides that when plaintiff's shareholders have received 51 per cent of the par value of their shares, the individual defendants shall be entitled to elect a majority of the directors of plaintiff.

Escrow instructions dated November 10 are signed by all parties, and obviously are a part of the agreement. These instructions, in addition to summarizing the provisions of the supplemental agreement described above, provide that plaintiff will deposit in escrow "executed stock powers . . . endorsed in blank," covering at least 80 per cent of all outstanding shares of plaintiff. The instructions also refer to "proxies" as being held in escrow.

Under the same date as the first agreement between plaintiff and defendants, plaintiff and the holders of "almost 80%" of its stock executed a document denominated "Purchase and Sale Agreement." It recites that its purpose is "to provide for the deferred purchase by [plaintiff] of all the stock of that company." It provides that the "purchase price to the stockholders shall be a sum equal to 120% of the par value of the stock" and that payment shall be made "from rentals received" by plaintiff from defendants "under agreement dated October 4, 1954." The terms of payment are precisely those set out in the agreement between plaintiff and defendants described above. The stockholders agree to deposit in escrow their certificates, endorsed in blank, and to execute proxies on the terms described in the escrow instructions and the supplemental agreement of the parties to this action. Although this agreement provides for delivery of the stock certificates to plaintiff upon payment of the 120 per cent figure, it separately grants to the individual defendants the option, after three years, to purchase all the stock upon payment of the balance of 120 per cent of total par value. Upon exercise of this option, the escrowholder is directed to deliver the

certificates to the individual defendants and "it is expressly agreed that this provision is for the benefit of [the individual defendants] and may be enforced by them." This agreement is a single document signed by a number of shareholders. Under date of "November —, 1954," the holders of more than 90 per cent of plaintiff's shares signed individual agreements substantially similar to the above, but also providing that payments by defendants under their agreement with plaintiff should be paid by plaintiff to its shareholders.

Plaintiff's president testified at the trial that the purpose of the entire transaction was the sale of plaintiff's stock to defendants. In 1957, plaintiff made its first distribution to shareholders of payments received from defendants. The president's letter forwarding these checks stated that "the payment to the stockholders at this time is in no sense a dividend, but is an installment payment on the purchase price of their stock." A later distribution, made after this controversy had arisen, was accompanied by a letter which made no reference to the first communication, but described the payment as a "liquidating dividend."

The trial court found that the agreements of the parties constituted a "lease purchase contract for the acquisition by [defendants] of substantially all of the assets of plaintiff," and that their purpose was to "accomplish the outright lease and purchase" of such assets, with the purchase price being distributed to plaintiff's shareholders as "liquidating dividends." It found that no sale of stock was contracted for, and that plaintiff committed itself only to apply to the commissioner for permission to transfer the shares. The trial court also took the view that the agreement between plaintiff and its stockholders was not with any of the defendants, and was but incidental to the "lease-purchase" agreement between the parties to this action. Judgment was in favor of plaintiff.

Defendants appeal, asserting that the evidence is insufficient to sustain these findings and that in fact the agreements are violative of the Corporate Securities Act, and therefore unenforceable. We agree.

■ It is clear that a contract for sale of corporate stock in violation of the escrow provision of a permit is void (*Duntley* v. *Kagarise,* 10 Cal.App.2d 394, 397 [52 P.2d 560]).

■ The conclusion is inescapable that the major purpose of the agreements of plaintiff and defendants was to effect a

sale to the latter of the shares of plaintiff. The deposit in escrow of executed stock powers which had the same effect as endorsement of the certificates themselves; the express provisions for distribution to plaintiff's shareholders of ''rentals'' paid by defendants; the prohibition of change in plaintiff's stock structure before full payment by defendants; and the provision for election of a majority of the directors by defendants after they had paid 51 per cent of the total price; all make completely clear that the consideration for defendants' payments was transfer of the shares of plaintiff. It is impossible to treat the agreements between plaintiff and its shareholders as distinct from the agreements of plaintiff and defendants. Plaintiff's president testified that the stockholders' agreement of October 4 was drawn to assure that they agreed to the contract with defendants before it was entered into by plaintiff corporation. The record as a whole leaves no doubt that defendants were fully aware of the provisions of the agreements between plaintiff and its stockholders, and that all parties treated them as a part of the arrangement between defendants and plaintiff. These stockholders' agreements show clearly that the transaction was for sale of the stock of plaintiff corporation. Strongly persuasive evidence also is furnished by the testimony of plaintiff's president and the letter which plaintiff forwarded to its stockholders over his signature.

We are unable to accept plaintiff's thesis, adopted by the trial court, that the agreement of the parties was one for the purchase of the assets of plaintiff. Nowhere in the voluminous documents constituting this agreement is there any provision for the transfer of any part of plaintiff's plant, machinery or equipment to defendants upon completion of the payments to be made by them. On the contrary, the first agreement requires return of plant and equipment to plaintiff corporation after full performance by defendants, a provision which would be incongruous if defendants were not to acquire the stock of plaintiff. The sole provisions for transfer of any consideration other than plaintiff's lease are the detailed references to transfer of stock.

Plaintiff argues that the agreement merely requires it to apply to the commissioner for permission to transfer the shares to defendants on completion of their payments. As we have pointed out, the agreement of plaintiff's shareholders is not so limited. Even the agreements between the parties

to this action, fairly construed, clearly contemplate stock transfer. They provide only for the situation which would arise if the escrow had terminated or if, assuming its continuation, the commissioner consented to the transfer. Implicit is the assumption that the commissioner cannot or will not refuse consent to the transfer, once the full consideration for the shares has been paid by defendants. At most, plaintiff's contention is an argument that the provision for sale of the stock is valid because made contingent upon ultimate approval of the sale by the commissioner. But it is established that such contingency provision, even when express, does not save an otherwise invalid agreement for sale (*Ogier* v. *Pacific Oil & Gas Dev. Corp.*, 135 Cal.App.2d 776, 779 [288 P.2d 101] ; *Los Angeles Transfer Co.* v. *Ritz Carlton Hotel Co.*, 7 Cal.App.2d 154, 158 [46 P.2d 186] ). The rule sought by plaintiff would, in the instant case, permit a seller to receive the full fruits of a prohibited sale before affording the commissioner any opportunity to withhold his consent to it.

The agreements before us provide for sale of the shares of plaintiff without consent of the commissioner. A substantial part of the purchase price has in fact been paid. It is conceded that the required consent of the commissioner has never been given. It follows that the agreements are in violation of the Corporate Securities Act and are unenforceable.

Plaintiff argues that the invalid features of the contract are but incidental, and that therefore the agreement is enforceable (*Fenolio* v. *McDonald,* 171 Cal.App.2d 508 [340 P.2d 657] ). Its reliance upon that decision is misplaced. As we have pointed out, the illegal provision for transfer of stock is a major, if not the principal, aim and purpose of the agreement here. It follows that the contract as a whole is unenforceable (*Wells* v. *Comstock,* 46 Cal.2d 528 [297 P.2d 961] ).

We are sympathetic with the trial court's desire to sustain the contract. In view of the financial condition of plaintiff at the time the agreements were entered into, it could be inferred that defendants substantially dictated the terms. To permit them to assert invalidity of the agreements as a defense is, in a sense, to permit them to rely upon their own wrong. However, questions of public policy far beyond the equities of the immediate parties are involved. To enforce the agreements here involved ''would be to open the door to

all the illegal practices condemned by the Corporate Securities Act'' (*Imperial Livestock etc. Co.* v. *Tracy,* 208 Cal. 205, 214 [281 P. 50]).

Judgment reversed.

Kaufman, P. J., and Shoemaker, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 22, 1961. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.