Denis McCAULEY, Appellant,

v.

James H. MICHAEL, Respondent.

Nos. 46627 and 46771.

Supreme Court of Minnesota.

July 1, 1977.

Frisch, Hutton and Kennedy and Patrick J. Neaton, Minneapolis, for appellant.

Efron & Kittler, Stanley Efron, and Peter H. Hitch, Minneapolis, for respondent.

Heard before YETKA, SCOTT, and WINTON, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal by Denis McCauley (McCauley) from the original findings and judgment of the Hennepin County District Court and from the denial of his postjudgment motion for amended findings or a new trial and the court's amended finding therein.

McCauley commenced this action against James Michael (Michael) to recover damages for alleged conversion of stock. The court held that McCauley was entitled only to receive back from Michael the money he had paid to him for the undelivered stock, and gave judgment for McCauley in the amount of $500 plus interest. McCauley's motion for a new trial or amended findings was denied by the trial court, which nevertheless amended one of its factual findings in a manner unfavorable to McCauley. Michael has not appealed the judgment against him.

■ Michael was an original incorporator of Mustang Investment Corporation (Mustang) and owner of 50,000 shares of initial capital stock. McCauley is a broker-dealer licensed to trade securities in the state of Minnesota. Lyle R. Morris, since deceased, was a corporate attorney for Mustang. On November 5, 1968, McCauley gave a check to Morris in the amount of $500. The check bore the notation "Mustang" in the lower left corner. McCauley testified that this check was intended to be used by Morris to purchase 1,000 shares of Mustang stock from Michael at $.50 per share. Morris gave a check to Michael on December 31, 1968, also in the amount of $500; this check bore the notation "1000 Mustang" at the top. Michael accepted this check and deposited it in his bank account. Between these two transactions, however, the Minnesota Commissioner of Securities ordered that the stock of Mustang "insiders," including Michael's 50,000 shares, be escrowed as a condition for a public offering. Michael entered an escrow agreement with American National Bank on December 19, 1968. Both before and after this escrow agreement Michael executed written declarations of trust for various amounts of his stock. Michael testified that he was unaware this was a violation of the commissioner's order of escrow.[1]

---

1. Minn.Reg. SDiv 43, applicable at the time of these transactions, read in relevant part: "Promotional shares may be required to be placed in escrow with an agent satisfactory to the Commission. Other shares issued to promoters may similarly be required to be placed in escrow. Escrowed securities or any interest therein shall not be sold or transferred until the written consent of the Commission or Commissioner shall have been first obtained." The purpose of this rule, now codified in Minn.St. 80A.12, subd. 5, is to prevent transfer of stock

No delivery of Mustang shares was made to McCauley, who thereafter became a director of Mustang. McCauley made several requests of Michael to provide him with evidence of his stock ownership during the escrow period; Michael responded that the matter would be taken care of. McCauley never received a written trust agreement from Michael, nor did Michael grant him an oral trust for the shares, although 1,000 shares were delivered to the Morris estate.

The escrow of shares was terminated on July 18, 1972, by the commissioner of securities. McCauley then demanded 1,000 shares from Michael, who refused to transfer any Mustang stock to him. McCauley commenced this action, seeking either damages for conversion of the stock or specific performance requiring Michael to deliver 1,000 shares to him.

The trial court found, as facts, that (1) Lyle Morris was acting as an agent for Michael on December 31, 1968, when he paid over to Michael $500 for McCauley's shares; (2) McCauley knew the shares were in escrow, but was not aware that their transfer was illegal; and (3) Michael knew the transfer of stock to McCauley was illegal. The trial court concluded that the contract between McCauley and Michael was illegal and unenforceable, and gave judgment for McCauley in the amount of $500 plus interest, the money he had paid to Morris for the shares. McCauley then moved for a new trial or amended findings. The trial court heard this motion and denied it on December 26, 1975. The order of denial, however, amended Finding of Fact XI to read that McCauley knew his stock purchase from Michael was illegal. The reason for this change, the court stated,

was "to more accurately reflect the Court's view that both parties had a full understanding of all the facts and circumstances surrounding their transaction."

The following legal issues are presented:

(1) Is McCauley entitled to enforce his stock purchase contract with Michael, despite its illegality?

(2) Was the trial court correct in finding the McCauley-Michael stock purchase contract illegal?

(3) Did the trial court improperly amend its finding of fact regarding McCauley's knowledge of the illegality?

(4) Was the trial court's amended finding clearly erroneous?

(5) Is rescission the proper remedy under the facts of this case?

1. Generally speaking, innocent purchasers of stock issued or sold in violation of "Blue Sky Laws" may recover by rescission or damages. *Vercellini v. U. S. I. Realty Co.*, 158 Minn. 72, 196 N.W. 672 (1924); *Kneeland v. Emerton*, 280 Mass. 371, 183 N.E. 155, 87 A.L.R. 1 (1932); Annotation, 87 A.L.R. 42, § XIV(b); CCH Blue Sky Law Reporter, par. 3675. The revised Minnesota Blue Sky Law specifically provides for such recovery in Minn.St. 80A.23, subd. 1.[2] On the other hand, if a purchaser is *in pari delicto* with the seller, he is barred from recovery. There is some ground between "innocent" and "*in pari delicto*"; in cases where the purchaser is less than innocent but not *in pari delicto* the law will generally favor the purchaser, since the Blue Sky Laws are intended for his protection. *Vercellini v. U. S. I. Realty Co.*,

---

of insiders to the public until the commission is satisfied the stock will have continuing value. Thus all contracts purporting to transfer such stock while it remains in escrow, either by trust or outright sale, are a violation of the rule.

**2.** Minn.St. 80A.23, subd. 1, provides: "Any person who sells a security in violation of sections 80A.08 or 80A.18, or of any condition imposed under section 80A.11, subdivision 4, or section 80A.12, subdivisions 5 and 6, is liable to the person purchasing the security from him, who may sue either in equity for rescission upon

tender of the security or at law for damages if he no longer owns the security. In any action for rescission, the purchaser shall be entitled to recover the consideration paid for the security together with interest at the legal rate, costs, and reasonable attorney's fees, less the amount of any income received on the securities. In an action at law, damages shall be the consideration paid for the security together with interest at the legal rate to the date of disposition, costs, and reasonable attorney's fees, less the value of the security at the date of disposition."

*supra*; *Kneeland v. Emerton, supra*; 87 A.L.R. 43. The purchaser will be permitted, in most cases if he has less than full knowledge of the illegality, to rescind the contract and receive back upon tender what he paid for the stock, or if he no longer owns the stock, to recover damages from the seller. The law thus seeks to return the parties to their positions prior to the illegal contract.

■ Enforcement of illegal stock contracts, however, is another matter. Earlier cases held that stock subscriptions made without complying with the Blue Sky Laws cannot be enforced against the subscriber (purchaser). 87 A.L.R. 105. This follows logically from the above rules because Blue Sky Laws are intended to protect the purchaser. The present case, however, is one in which the purchaser seeks to enforce an assumedly illegal stock contract. Innocent members of the class protected by Blue Sky Laws, including purchasers, may enforce bargains made in contravention of those laws. 6A Corbin, Contracts, § 1540, p. 836; Calamari & Perillo, Contracts, § 377(c).

■ It would again follow that while innocent purchasers may enforce, as well as rescind, contracts violating the Blue Sky Law, purchasers *in pari delicto* could not. Corbin states:

"The statements in this section [1540] are applicable where the parties plaintiff are wholly innocent and are not active participants in making the bargain, but also where they are coerced or gullible participants but are not regarded as *in pari delicto.*" 6A Corbin, Contracts, § 1540, p. 840.

Corbin would therefore allow enforcement in two cases: (1) Where the purchaser knows nothing of the illegality of the transaction, and (2) where the purchaser has been drawn into the illegal transaction by a seller with superior experience or knowledge. This appears to be somewhat stricter on the purchaser than when only rescission or damages are sought, but this distinction has a logical basis. In seeking to rescind an illegal contract, the purchaser asks only for his original consideration, thus returning him to his status prior to the bargain. Enforcement of the contract, by specific performance or damages, however, is a much stronger contractual remedy, and may cause considerable loss to the seller. Even though the Blue Sky Laws do not intend to protect sellers who have acted unlawfully, neither do they intend to offer remedies to less-than-innocent purchasers. Further, the right to enforce an illegal stock contract offers an opportunity to the unscrupulous purchaser to elect his remedy; if the stock rises, enforcement; if the stock falls or becomes valueless, rescission. This right of election should be offered only to purchasers Corbin describes as either "wholly innocent" or "gullible participants." Stated another way, a purchaser seeking enforcement of a stock contract violating the Blue Sky Laws should be held to a high standard of "clean hands"—when rescission is sought, the standard may be anything less than *in pari delicto.*

■ The facts of this case show that McCauley does not satisfy the standard applicable for enforcement. McCauley is a registered broker-dealer, and has been employed in the securities field since 1961. He cannot, therefore, be characterized as "gullible" in regard to purchasing stock of "insiders." Nor can he be regarded as an innocent purchaser. His testimony shows that at the time of his purchase he was aware Michael's shares would be placed in escrow, he knew the reason for the escrow requirement, and he fully understood that escrowed shares cannot be transferred by any means. He did explain his contention that he had purchased the stock prior to the escrow agreement, which in his view made the purchase a legal bargain, but this is not relevant to the question of his innocence. The point is that he knew the problems attendant upon the purchase of stock of insiders when "going public" is being contemplated, and this knowledge prevents him from relying on the doctrine of an "innocent purchaser" or "gullible participant" to enforce the contract should it turn out to be illegal. McCauley's knowledge and experience generally as a licensed bro-

ker-dealer, and his specific knowledge of this particular transaction, will not allow him to enforce the stock contract with Michael if that contract contravenes the Blue Sky Laws.

█ Several cases from other jurisdictions support this conclusion. In *Morris v. Durbin,* 123 Ga.App. 383, 180 S.E.2d 925 (1971), Morris executed a note for $10,000, with Durbin as payee, in payment for 100,-000 shares of Durbin's stock. The stock was being held in escrow by order of the Georgia commissioner of securities. Following termination of the escrow, Durbin sought to enforce the note against Morris. The court held the transaction "voidable at the election of the purchaser and unenforceable," noting that:

"* * * The term 'in escrow' as used in the statute means, in our opinion, that the securities are to be placed absolutely beyond the control of the depositor. * * The escrow agreement obviously was intended to accomplish this purpose in providing for no transfer of the shares or any interest therein." 123 Ga.App. 385, 180 S.E.2d 926.

Although that is a case of the seller attempting to enforce, rather than the buyer as in this case, the principle is clear: Agreements to transfer escrowed stock are unenforceable.

█ The case of *Black Point Aggregates, Inc. v. Niles Sand & Gravel Co.,* 188 Cal. App.2d 375, 10 Cal.Rptr. 761 (1961), provides a more detailed analysis of the problem, although this was also a case of attempted enforcement by the seller. In holding that the contract for sale of escrowed stock was void, the court reasoned as follows:

"* * * As we have pointed out, the illegal provision for transfer of stock is a major, if not the principal, aim and purpose of the agreement here. It follows that the contract as a whole is unenforceable." 188 Cal.App.2d 381, 10 Cal.Rptr. 765.

In reflecting on the fact that the defendant-purchasers were not without fault, the court continued:

"* * * To permit [defendants] to assert invalidity of the agreements as a defense is, in a sense, to permit them to rely upon their own wrong. However, questions of public policy far beyond the equities of the immediate parties are involved. To enforce the agreements here involved 'would be to open the door to all the illegal practices condemned by the Corporate Securities Act.'" 188 Cal. App.2d 381, 10 Cal.Rptr. 765.

The present case also involves a defendant not without fault, i. e., Michael, and although he is the seller the public policy considerations are the same: Enforcement of contracts violating the securities laws may lead to results intended to be prevented by those laws, whether enforcement is sought by the purchaser or seller. As noted above, a knowledgeable purchaser could contract with an equally knowledgeable seller for the transfer of escrowed securities, and then simply wait until the escrow terminates to decide whether to enforce or rescind. While the securities laws intend protection of the purchaser, they do not intend such results whatever the equities of a particular case. *Black Point* supports this conclusion.

Finally, the case of *Hederman v. George,* 35 Wash.2d 357, 212 P.2d 841 (1949), holds squarely that purchasers may not enforce contracts for the purchase of escrowed promotion stock. In *Hederman,* options to purchase escrowed promotion stock were granted by George to several individuals. George died while the stock was still in escrow, and Hederman sought to exercise his option as a claim upon George's estate. The Supreme Court of Washington held the options [3] unenforceable, beginning with these general observations:

---

**3.** The court found no reason to distinguish between options and present sales: "* * * [A]ny attempt to distinguish between a present sale and the type of contract before us would

be begging the question. To hold otherwise would be to subvert the entire purpose of that section of the act which seeks to prevent the sale of promotion stock before its release, and

"* * * It is a general rule that where the contract grows immediately out of, and is connected with, an illegal act, a court of justice will not lend its aid to enforce it. * * * Where a plaintiff, to make a case, must rely upon the illegal contract itself, he cannot recover. The law will aid neither party to an illegal agreement, but will leave the parties where it finds them. * * * A contract which is contrary to the terms and policy of an express legislative enactment is illegal and unenforcible." 35 Wash.2d 361, 212 P.2d 843.

The court then quoted the following passage from Pomeroy, Specific Performance of Contracts (3 ed.) 651, § 286:

" 'Where two persons with equal knowledge and equally participating in the fault, have entered into an illegal agreement, and one of them has obtained by the other's voluntary act all the benefit of it for himself, his refusal to perform on his own part is, generally considered in itself alone, unjust and inequitable; but the law sustains him in this position, because it takes into account the interests of society and of the state, which demand the complete suppression of such agreements.' " 35 Wash.2d 362, 212 P.2d 843.

Applying this analysis to the facts, the court went on:

"Appellants testified that they knew they were dealing in promotion stock; that it was being pooled in escrow during the financing of the company, upon the order of the director of licenses. They knew that it was illegal for them to contract for its purchase while it was being so held. * * * But, in spite of their knowledge, they sought to circumvent the statute by contracting to buy promotion stock at five cents a share. The purpose of the act was to prevent such

sales during the period in which a public offering of the treasury stock was being made. The contracts were illegal and will not be enforced by the courts." 35 Wash.2d 362, 212 P.2d 844.

This conclusion comports with the method of analysis developed above, and is directly applicable to the facts of the present case.

■■■ The rule might be thus stated: Where a contract for the sale of stock contravenes the securities laws, it may be enforced only by the innocent or gullible purchaser, who has purchased in good faith and without knowledge of any facts leading him to believe that the contract for sale may be illegal. In all other instances, enforcement will be denied. The evidence in this case shows, as stated above, that McCauley does not come under this narrow category, and hence he cannot enforce his contract with Michael if that contract is found to be illegal.[4]

■■■ 2. McCauley argues that his purchase of Mustang stock took place on November 5, 1968, when he paid $500 to Morris, corporate attorney for Mustang. This date was some 6 weeks prior to the escrow of Michael's stock. It is clear, however, that no contract was formed until December 31, 1968, when Morris paid this same sum over to Michael. The trial court found that on December 31, Morris was acting as an agent for Michael by turning over to him the sum he had received from McCauley. The trial court did not find that Morris was acting in this capacity on November 5 when he accepted McCauley's check—at this point it could well be said that Morris was acting as McCauley's agent for the purchase of Michael's stock. The evidence indicates that Morris was empowered by Michael to engage others in trust agreements for his stock by means of blank agreements which Michael had already

would permit, through the medium of so-called 'option' contracts, the transfer of and speculation in any or all such stock long before its release by the director of licenses." *Hederman v. George,* 35 Wash.2d 357, 363, 212 P.2d 841, 844 (1949).

4. *Schug v. Michael,* Minn., 245 N.W.2d 587 (1976), although similar and involving the same defendant, can be distinguished because of a different state of knowledge, a different background, and a completely different documentary relationship between the parties than in the case at hand.

signed. This Morris did on a number of occasions. Morris did not actually buy and sell Michael's stock, however, absent the use of the trust agreements. Thus, when McCauley gave Morris a check, no contract could be formed since Michael had not either by a writing or by word evinced his willingness to sell stock to McCauley, via trust agreement or otherwise.

When Michael accepted and deposited Morris' check for the shares, however, a contract arose obligating Michael to deliver shares to McCauley in consideration for the payment received. By this time the escrow had been ordered and executed, and delivery could not be made. The contract was thus in violation of the escrow order[5] and in contravention of the Blue Sky Law provision empowering the commissioner to make such an order. Minn.St.1971, § 80.08.

What emerges from the somewhat confusing facts of this case is this: What McCauley wanted, by his own admission, was a trust agreement similar to those held by others for Michael's stock. Since Michael gave McCauley no oral or written trust during the period from November 5 to December 31, the earliest McCauley could have received such a trust was upon Michael's receipt of his payment from Morris. Any trust issued at that time would have been illegal, hence any contract obligating Michael to form such a trust was also illegal. The trial court was correct in finding the stock contract illegal, and thus unenforceable as discussed above.

■■■ 3. Following the trial and entry of findings and judgment by the district court, McCauley moved for amended findings or a new trial. The trial court denied McCauley's motion, but did amend one of its factual findings in a manner not requested by McCauley in his motion. McCauley asserts that this action exceeds the authority of the court under the Rules of Civil Procedure. Michael argues that a moving party should not be allowed to "pick and choose what should be contained in the findings without having the entire findings reviewed and put in proper perspective."

Rule 52.02, Rules of Civil Procedure, provides in relevant part:

"Upon motion of a party made not later than the time allowed for a motion for new trial pursuant to Rule 59.03, the court may amend its findings or make additional findings, and may amend the judgment accordingly if judgment has been entered."

The order denying the motion and making the amended finding reads as follows:

"1. That plaintiff's motion is in all parts denied.

"2. That on motion by the Court Finding of Fact XI is amended to read as follows: 'The plaintiff knew that the stock he was to receive was being held in trust and was aware that this was in contravention of the Security Statutes of the State of Minnesota and the rules and regulations promulgated thereunder by the Commissioner of Securities.'

\* \* \* \* \* \*

"MEMORANDUM

"The Court has amended Paragraph XI of its original Findings of Fact to more accurately reflect the Court's view that both parties had a full understanding of all the facts and circumstances surrounding their transaction; the return of the $500 to the plaintiff set forth in the Conclusions of Law may stand since it would be inappropriate for the defendant to benefit from his acts relative to this transaction."

Rule 52.02 itself places no restrictions on the court in ruling upon a motion for amended findings. A party may, of course,

---

**5.** Section 5 of the escrow agreement with American National Bank reads: "During the period of holding the deposited certificates and shares in escrow, no transfer or other disposition of said certificates or shares or of any interest therein is to be made whether subject to this Escrow Agreement or otherwise; all of said certificates and shares are to be held intact as issued and placed in escrow hereunder, and the Escrow Agent shall not recognize or take notice of any purported transfer or other disposition of said certificates or shares or of any interest therein."

choose to challenge only selected findings, but by making the motion the party is in essence asking the judge to reexamine all of the evidence in the case to see if his initial findings accurately reflect his view of that evidence. Since findings of fact are frequently interrelated, and since a number of findings may be based upon a single piece of evidence or the testimony of a single witness, the trial judge must be free to review all of the evidence and all of his findings when such a motion is made. The judge may find that in some cases new findings in favor of the moving party are appropriate, while in others revision unfavorable to the movant is appropriate. As Michael points out, a party moving for amended findings may not "pick and choose" among the findings in the hope of thereby limiting the trial court's review of the record only to those parts supporting the motion. The trial judge must be free to examine all of the evidence before him, and then to enter amended findings as appear to him warranted by his review of the record as a whole.

The trial court in this case chose to characterize its amended finding as pursuant to the court's own motion. It may fairly be assumed, however, that the trial court used this language because it was ruling adversely to McCauley's motion, and therefore felt that any adverse amendments had to be by its own motion. However, it is clear that the trial court reviewed "all the files, records and proceedings herein," and made the amendment "to more accurately reflect the Court's view that both parties had a full understanding of all the facts and circumstances surrounding their transaction." The trial court followed the proper procedure for review of its findings.[6]

■ 4. McCauley argues that the trial court's amended finding, which charges him with full knowledge of the illegality of the transaction, is clearly erroneous with no evidence to support it. McCauley appears to believe that his purchase took place when he paid Morris, and at this time the escrow had not yet been imposed. He was aware that shares of insiders are often escrowed as a condition of going public, and that such escrowed shares cannot be transferred. Once McCauley realized that the stock was in escrow, he knew it could not be transferred, but he nevertheless sought an instrument of trust which he knew to be a violation of the escrow order. It is clear that he was well aware of the possibility it might be an illegal transfer which should not have been pursued without approval of the commissioner of securities. In this sense he was aware that the transaction might be illegal, and certainly knew that transfer of shares while in escrow was illegal. Based upon all the evidence, the trial court's amended finding is not clearly erroneous.

■ 5. The authorities cited above make it clear that rescission is always available to the innocent purchaser of securities where the Blue Sky Laws have been violated. By the same token, a purchaser *in pari delicto* with the seller may not recover. See, e. g., CCH Blue Sky Law Reporter, par. 3675.

The new statute on purchaser remedies, Minn.St. 80A.23, permits rescission for the purchaser in subd. 1, but in subd. 9 bars recovery under the contract by persons "with knowledge of the facts by reason of which its making or performance was in violation of the securities act." Rescission in this sense, that is, return of money upon tender of the securities, is an equitable remedy, and is actually restitutionary in character. Since McCauley never received the securities, but at most an illegal contractual obligation to receive them following the escrow, the cancellation of this contract makes return of his initial payment appropriate. McCauley's knowledge was sufficient to bar him from suit under the contract (§ 80A.23, subd. 9), but not so exten-

---

**6.** The amendment was presumably made to show that McCauley was *in pari delicto* with Michael in connection with this transaction. As developed above, however, the record shows that although McCauley was not *in pari*

*delicto* with Michael, he cannot be considered an innocent purchaser under the circumstances, and thus cannot enforce the contract. Hence this finding is not crucial to the outcome of the case.

sive as to prevent refund of his money given in the illegal transaction.

Although the new statute does not by its terms apply to this case, since it was passed in 1973, it does little more than codify existing common-law remedies in this area. 6A Corbin, Contracts, § 1540; see, also, Restatement, Contracts, §§ 598 to 605, especially § 604. The trial court properly refused to enforce the bargain, or alternatively to grant damages for breach of contract. On the other hand, as the court noted in its memorandum attached to the amended finding, "it would be inappropriate for the defendant to benefit from his acts relative to this transaction." The return of McCauley's $500 will leave the parties where they were prior to this transaction.

Affirmed.