**PECK OF CHEHALIS, INC., a Washington Corporation; Peck of Oak Harbor, Inc., a Washington Corporation; Peck of Aberdeen, Inc., a Washington Corporation, a/k/a C. K. of Aberdeen (Washington); and C. K. of Ferndale, Inc., a North Dakota Corporation, Plaintiffs and Appellees,**

v.

**C. K. OF WESTERN AMERICA, INC., a North Dakota Corporation; John Olness; and Bernie E. Askelson, Defendants, Third-Party Plaintiffs, and Appellants,**

v.

**Jerry O. BRANTNER and Vogel, Brantner, Kelly, Knutson, Weir & Bye, a partnership, Third-Party Defendants and Appellants.**

Civ. No. 9844.

Supreme Court of North Dakota.

April 3, 1981.

Shaft, McConn, Fisher & Thune, Grand Forks, for plaintiffs and appellees; argued by Patrick W. Fisher, Grand Forks.

Jeffrey J. Keyes, of Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn. and David S. Maring, of Stefanson, Landberg & Alm, Moorhead, Minn., for defendants,

third-party plaintiffs, and appellants; argued by Jeffrey J. Keyes, Minneapolis, Minn.

John D. Kelly, of Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, and Gerald S. Rufer, of Rufer, Hefte, Pemberton, Schulze, Sorlie & Sefkow, Fergus Falls, Minn., for third-party defendants and appellants; argued by Gerald S. Rufer, Fergus Falls, Minn.

VANDE WALLE, Justice.

C. K. of Western America ("CKWA"), John Olness, Bernie E. Askelson, and Jerry O. Brantner, and the law firm of Vogel, Brantner, Kelly, Knutson, Weir & Bye appeal from a summary judgment entered by the district court of Grand Forks County in favor of the four plaintiff corporations. We reverse and remand.

Each of the four plaintiff corporations serves as a foundation for the operation of a Country Kitchen restaurant. Three of these companies, Peck of Chehalis, Inc., Peck of Oak Harbor, Inc., and Peck of Aberdeen, Inc., are Washington corporations set up in the mid-1970s by Richard Clark and Richard Grose, both North Dakota residents at the time of the incorporations. The fourth corporation, C. K. of Ferndale, Inc., is a North Dakota corporation not originally incorporated by Clark and Grose but whose entire stock was purchased by them in 1978.

CKWA was, from the time of its incorporation in North Dakota in 1973, at all times relative to the circumstances which culminated in this lawsuit, engaged in franchising Country Kitchen restaurants in various western States, including Washington. CKWA, which was owned by John C. Olness and Bernie E. Askelson, had obtained the rights to franchise Country Kitchen restaurants in these States from Country Kitchen International, Inc., a Minnesota corporation not a party to this action. Olness and Askelson sold their interest in CKWA to Country Kitchen International, Inc., in 1979.

Third-party defendant Jerry O. Brantner is an attorney and a member of the law firm of Vogel, Brantner, Kelly, Knutson, Weir & Bye, of Fargo, North Dakota. During the entire existence of CKWA, Brantner was a member of its board of directors and was the corporation's legal counsel.

In early 1975, Clark, then a North Dakota farmer with a bachelor's degree in agriculture, and Grose, at the time a school administrator at Forest River, North Dakota, apparently began to consider investing in the restaurant business. As the result of their personal experience and observations they concluded that the Country Kitchen approach to dining held the most potential for a profitable return on the type of investment they were interested in making.

In pursuit of their investment interest, Clark and Grose traveled to a Country Kitchen in Fargo and inquired as to where they might find out about the availability of Country Kitchen franchises. They were directed to the headquarters of CKWA in Moorhead, Minnesota, and there they talked with Don Coleman, a franchise salesman for CKWA. Because of the unavailability of franchise sites in the immediate area, the discussions regarding the purchase of franchises by Clark and Grose centered on available sites in the State of Washington. The two men met with Coleman approximately four times in CKWA's Moorhead offices during 1975. Various other meetings and communications took place involving Clark, Grose, and CKWA representatives in both North Dakota and Minnesota during 1975. The focus of this interaction was the negotiation of franchise purchases by Clark and Grose. In addition, Clark, Grose, and Coleman traveled to Washington in early summer of 1975 for the purpose of investigating potential site locations.

The negotiations between Clark, Grose, and CKWA resulted in the formation by Clark and Grose of a Washington corporation, Peck of Chehalis, Inc., which entered into a franchise agreement with CKWA on December 31, 1975, in Moorhead, Minnesota, for a Country Kitchen to be located in Chehalis, Washington. Before entering into this agreement, CKWA provided Clark and Grose with an "offering circular" con-

taining information of the nature specified in Wash.Rev.Code § 19.100.080. That section of the Franchise Investment Protection Act of the State of Washington requires disclosure of certain information from a person offering for sale or selling a franchise to a prospective franchisee if the offer or sale takes place in Washington. In a subsequent deposition, Clark agreed that this information fairly and accurately represented the investment as he found it.

On March 4, 1976, a second franchise agreement was entered into for a Country Kitchen restaurant, to be located in Oak Harbor, Washington. This agreement was signed in Moorhead, Minnesota, and was between Peck of Oak Harbor, Inc., another Washington corporation set up by Clark and Grose, and CKWA. On June 1, 1976, Peck of Aberdeen, Inc., the third Washington corporation established by Clark and Grose, entered into a franchise agreement with CKWA for a Country Kitchen to be located in Aberdeen, Washington. The Aberdeen agreement was also signed in Moorhead, Minnesota. Under each of the three franchise agreements Clark and Grose and their wives personally guaranteed the obligations of each of the three corporations.

The background of the fourth plaintiff corporation, C. K. of Ferndale, Inc., differs from the other three in that it was incorporated in North Dakota by several persons from Devils Lake and on June 27, 1975, it entered into a franchise agreement with CKWA. On May 25, 1978, Clark, Grose, and Don Coleman, the franchise salesman for CKWA, purchased all the stock of Ferndale, Inc. Clark and Grose had no contact with CKWA regarding the negotiations which resulted in their purchase of C. K. of Ferndale, Inc. This particular transaction involved only the owners of C. K. of Ferndale, Inc., Clark, Grose, and Coleman.[1]

The Chehalis, Oak Harbor, and Aberdeen restaurants have been owned and operated by the Peck corporations for four or more years. The Ferndale Country Kitchen has been operating for four years, the past two years under the control of Clark and Grose. For all of these years, until the district court granted their motion for summary judgment, the plaintiff corporations have used the Country Kitchen logos, trademarks, symbols, and methods of operation. The plaintiffs were provided with Country Kitchen operational manuals, training manuals, menus, sale materials, sign specifications, and numerous indicia of the Country Kitchen restaurant system. Extensive training sessions were provided to the plaintiffs at the Country Kitchen training center. Finally, through July 1979, the plaintiff corporations received approximately $47,000 in profits from the operation of the four Country Kitchen restaurants.

The plaintiffs initiated this lawsuit on December 20, 1978. In the suit the plaintiffs sought to rescind the four franchise agreements entered into with CKWA. In addition, the plaintiffs asked for return of the original $23,000 franchise fee for each of the three Peck franchises, the $17,000 original fee for the Ferndale franchise, and $245,691.06 representing continuing franchise fees and advertising fees paid to CKWA by the plaintiffs during the lifetime of the franchise agreements. Finally, the plaintiffs sought all costs, disbursements, and reasonable attorney fees incurred by them relative to this action. The basis for the plaintiffs' action against CKWA is that CKWA failed to register with the Commissioner of Securities in both North Dakota and Minnesota pursuant to the requirements of the North Dakota Franchise Investment Law (N.D.C.C. § 51–19–01 et seq.) and the Minnesota Franchise Act (Minn. Stat.Ann. § 80C.01 et seq.).

The third-party complaint in this action seeks indemnity or contribution from Jerry O. Brantner and the law firm of Vogel, Brantner, Kelly, Knutson, Weir & Bye. CKWA, as third-party plaintiff, asserts in this action that if it is found to be liable in the action brought by the plaintiff corpora-

---

1. Subsequent to the initiation of this lawsuit, Don Coleman became a 25 percent owner of

the three Peck corporations.

tions, the reason for that liability lies in the third-party defendants' negligent legal advice relative to the franchise laws in North Dakota and in Minnesota.

The proceedings below which led to this appeal are as follows: The plaintiffs moved for a summary judgment asserting that CKWA's failure to register the franchises in North Dakota and Minnesota automatically entitled the plaintiffs to rescission of the franchise agreements under either the North Dakota or Minnesota franchise laws. CKWA opposed the plaintiffs' motion on the basis that CKWA should be allowed to raise equitable defenses involving fact issues precluding summary judgment. CKWA also made a cross-motion for summary judgment asserting lack of jurisdiction, lack of causation of injury, and applicability of Washington law. The district court granted the plaintiffs' motion for summary judgment, denied CKWA's cross-motion, and reserved for a later trial the determination of the amount of money the plaintiffs are entitled to as part of the rescission. Pursuant to N.D.R.Civ.P. 54(b), the district court directed entry of final judgment. This ruling was specifically made to allow for speedy review of this matter.[2]

CKWA raises four issues on this appeal:

1. Whether or not a showing of harm is a prerequisite to the granting of rescission for failure to register under the North Dakota and Minnesota franchise laws.

2. Whether or not CKWA is entitled to raise equitable defenses to a claim for rescission under the North Dakota and Minnesota franchise laws.

3. Whether or not the jurisdictional provisions of the North Dakota Franchise Investment Law have been met.

4. Whether or not Washington law should have been applied by the district court to validate the franchise agreements.

 As mentioned earlier, this appeal is before us following a summary judgment entered in favor of the plaintiff corporations. The purpose of the summary judgment, under Rule 56, N.D.R.Civ.P., is to promote the expeditious resolution of a legal conflict on its merits, without a trial, where there exists no dispute as to material facts and where only a question of law must be determined. *Pioneer State Bank v. Johnsrud,* 284 N.W.2d 292 (N.D.1979). It is the party moving for summary judgment who must clearly demonstrate that there is no genuine issue of material fact. *Yegen v. City of Bismarck,* 291 N.W.2d 422 (N.D. 1980). A summary judgment may be based upon the pleadings, depositions, admissions, affidavits, interrogatories, and the inferences that may be drawn therefrom. *Pioneer State Bank v. Johnsrud, supra.* On an appeal from summary judgment, this court will limit its review to a determination of whether or not the information available to the trial court, when viewed in a light most favorable to the opposing party, precluded a genuine issue as to any material fact and entitled the moving party to summary judgment as a matter of law. *Sayler v. Holstrom,* 239 N.W.2d 276 (N.D.1976). With that standard of review in mind we turn first to the general structure of the franchise laws involved in this case and then address the issues raised by CKWA.

This is the first time we have been asked to apply the registration requirement and a civil liability provision of Chapter 51–19, N.D.C.C. In *Country Kitchen, Etc. v. Country Kitchen, Etc.,* 293 N.W.2d 118 (N.D. 1980), we dealt with the registration requirement but did not have an issue regarding the civil liability provision of the North

**2.** CKWA subsequently moved for summary judgment against the third-party defendants on the ground that, in light of the court's ruling that the plaintiffs were automatically entitled to rescission, Brantner and the law firm were, as a matter of law, negligent in advising CKWA that it did not have to register the franchise in North Dakota.

In addition to the claims for rescission under the North Dakota and Minnesota franchise laws, the plaintiffs' complaint and CKWA's counterclaim included a common-law breach-of-contract claim. The breach-of-contract claim was not part of either plaintiffs' or CKWA's summary-judgment motions.

Dakota franchise law before us. In *Country Kitchen, Etc., supra,* we held that failure of a franchiser to register under the franchise law does not make void a contract between the franchiser and the franchisee because the Legislature has expressly provided exclusive remedies in the Act for violations, and automatic invalidation of the contract is not among these remedies.

Chapter 51–19, N.D.C.C., the North Dakota Franchise Investment Law, was enacted in 1975 to protect potential franchisees in North Dakota from unfair contracts and other prevalent and previously unregulated abuses in the growing national franchise industry.[3] The primary thrust of Chapter 51–19 in its attempt to protect North Dakota investors is the requirement that any person offering or selling a franchise in this State must make application for registration with the Commissioner of Securities and file a proposed prospectus making full disclosure of all facts required by statute or the rules of the Commissioner. N.D.C.C. Sections 51–19–06 and 51–19–08.[4] The franchiser is required to present the prospectus to each prospective franchisee at least seven days before any franchise contract is entered into or any consideration is paid by the franchisee. N.D.C.C. Section 51–19–08(6).[5] The person offering or selling a franchise must file any report required by the Commissioner and must keep a set of books and records open to inspection by the Commissioner. N.D.C.C. Section 51–19 -16(1).[6] The Commissioner is given the power to deny, suspend, or revoke registration upon grounds stated in N.D.C.C. Section 51–19–09.[7] The Commissioner may also impose such conditions, limitations, or restrictions as he deems necessary to carry out the purposes of the Act. N.D.C.C. Section 51-19-13.[8] It is unlawful to sell or offer a franchise for sale in North Dakota unless the offer has been registered or has been exempted from registration. N.D.C.C. Section 51–19–03.[9] A violation of N.D.C.C. Section 51–19–03 subjects the franchiser and those persons in control of the franchiser to liability for damages, rescission, or such other relief as the franchisee may seek under N.D.C.C. Section 51–19–12.[10]

It is undisputed that CKWA did not register under either the North Dakota or Minnesota franchise laws prior to entering into the franchise agreements at issue here. The district court, while expressly reserving for a later trial the question of whether or not or to what extent CKWA must reimburse the plaintiffs, reasoned that the Legislature, upon enacting N.D.C.C. Section 51–19–12, the section under which the plaintiffs here proceed, must have taken into consideration the provisions of Chapter

3. Minnesota's counterpart to North Dakota's Chapter 51–19 is the Minnesota Franchise Act and is found at Minn.Stat.Ann. § 80C.01 et seq. The North Dakota and Minnesota franchise laws are substantially the same.

4. For Minnesota see Minn.Stat.Ann. §§ 80C.04 and 80C.06.

5. For Minnesota see Minn.Stat.Ann. § 80C.-06(5).

6. For Minnesota see Minn.Stat.Ann. see §§ 80C.08 and 80C.10.

7. For Minnesota see Minn.Stat.Ann. § 80C.12.

8. For Minnesota see Minn.Stat.Ann. § 80C.15.

9. For Minnesota see Minn.Stat.Ann. § 80C.02.

10. N.D.C.C. Section 51–19–12, *Civil Liability,* states, in part:

"1. Any person who violates any provision of this chapter or any rule or order issued by the commissioner thereunder shall be liable to the franchisee or subfranchisor who may bring an action for damages, for rescission, or for such other relief as the court may deem appropriate.

"2. Every person who directly or indirectly controls a person liable under subsection 1, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, and every employee of a person so liable who materially aids in the act or transaction constituting the violation is also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."

For Minnesota see Minn.Stat.Ann. § 80C.17.

32–04, which deals with the specific relief of rescission as a special form of action. The district court decided that N.D.C.C. Section 32–04–21 was applicable to the issue at hand.[11] With that section in mind, and after concluding that CKWA had sold the franchises in North Dakota, the district court, in its ruling, concluded:

"And so from the foregoing, it appears to the Court that under the statutes and the cases that the plaintiffs should have a right to rescind as a matter of law pursuant to the facts that are not in dispute and the statutes that I referred to herein and that it is a right to rescind upon application rather than upon a full resort to the asserted equitable defenses that the defendants have mentioned. And that in arriving at that conclusion the Court would have to find as a fact that the contract was unlawful for a cause not apparent on its face, that being that no application or no registration had been done in North Dakota and that that would have been known to the licensor corporation and in accordance with the answers to interrogatories was not known at the time to Mr. Grose and Mr. Clark. And that the matter was one of the causes permitted under Section 9–09–09(2):

" 'If through the fault of the party as to whom he rescinds the consideration for his obligation fails in whole or in part.' "

In its conclusions of law, the district court stated that the Ferndale franchise agreement was entered into in violation of Minn.Stat.Ann. § 80C.17, that the three Peck franchise agreements violated N.D. C.C. Section 51–19–12, and thus all four contracts were unlawful and subject to automatic rescission under N.D.C.C. Section 32–04–21. We cannot agree with the reasoning employed by the district court.

In *Country Kitchen, Etc. v. Country Kitchen, Etc. supra*, we quoted from *Ets-*

*Hokin & Galvan, Inc. v. Maas Transport, Inc.*, 380 F.2d 258, 260 (8th Cir.), *cert. denied* 389 U.S. 977, 88 S.Ct. 481, 19 L.Ed.2d 471 (1967), as follows:

"A contract in violation of a statutory provision generally is void or illegal only if the legislative body enacting the statute evidences an intention that such contracts be considered void or illegal. Otherwise, even though the parties to a contract may be subject to a statutory penalty as the result of performing a contract, the contract itself remains in full force and effect." 293 N.W.2d at 121.

We also pointed out that the North Dakota Franchise Investment Law reflected no intent on the part of the Legislature that franchise agreements are to be considered void in their inception where the franchiser fails to register the offer. We believe that this same lack of intent extends to determination of the unlawfulness of such an agreement. Further, while *Country Kitchen, Etc., supra*, stood for the proposition that franchise agreements entered into under conditions such as the ones involved here are not void at their inception, that case does not stand for the proposition that the mere mechanical act of applying for rescission of the contract under either N.D.C.C. Section 32–04–21 or Section 51–19–12 should result in automatic rescission. However, although the trial court arrived at such a conclusion, we have stated that a judgment will not be reversed simply because it rests upon inapplicable reasons. *Damm v. National Insurance Company of America* 200 N.W.2d 616 (N.D.1972). We point out again that our standard of review here is the determination of whether or not a disputed issue of material fact exists to preclude summary judgment. If we determine that such an issue exists we must, in addition to setting aside the reasoning of the trial court in this case, set aside the

**11.** N.D.C.C. Section 32–04–21, *When rescission of contract adjudged,* reads:

"The rescission of a written contract may be adjudged on the application of the party aggrieved:

"1. In any of the cases mentioned in section 9–09–02;

"2. When the contract is unlawful for causes not apparent upon its face and when the parties were not equally in fault; or

"3. When the public interest will be prejudiced by permitting it to stand."

result of that reasoning. However, before making that determination, a preliminary matter must be considered.

■ We have concluded that a violation of the franchise law does not render a subsequent franchise agreement void. *Country Kitchen, Etc., supra.* We have also concluded herein that a violation of franchise law does not place a franchisee in a position where he is entitled to automatic rescission under N.D.C.C. Section 51–19–12 as a matter of law. The obvious result of these conclusions is that something more than a mere showing of a violation of the franchise law is necessary in order that a franchisee may rescind a franchise agreement under N.D.C.C. Section 51–19–12. The logical question arising from the result we have reached is: What is necessary for rescission under N.D.C.C. Section 51–19–12? We point out here that it is this court's position that questions the answers to which are not necessary to the determination of the case need not be considered. *Hospital Services v. Brooks,* 229 N.W.2d 69 (N.D.1975). The only question facing this court in the present appeal is whether or not an issue of material fact exists which would preclude summary judgment. However, notwithstanding our belief that an attempt to fully answer the above-posed question may prove fruitless and result in confusion, and notwithstanding the fact that we are not obligated in this appeal to provide such an answer, we see as necessary the establishment of a minimum requirement for a successful action brought under N.D.C.C. Section 51–19–12.[12]

We believe that an effort to establish a minimum requirement for rescission under the franchise laws necessarily leads to an examination of the same issue as it relates to the Blue Sky Law. This belief is anchored in our observation that the statutory regulation of franchises is strongly analogous to the statutory regulation of securities. The regulation of franchises and the

regulation of securities share the common goal of protecting the investing public from certain unscrupulous business practices by requiring sellers of franchises and securities to fully disclose relevant investment information to prospective buyers. In North Dakota and in Minnesota the regulation of both securities and franchises requires registration of the seller in the State before offers or sales can be made therein. The similarities between these two regulatory schemes is also highlighted by the fact that they are both administered through the office of the Securities Commissioner. In Minnesota the close relationship between the two regulatory formats is further evident by the appearance of the franchise Act within Chapter 80 of the Minnesota Statutes, the chapter on securities. While the rationale and structure of the franchise and securities laws are substantially similar, this court has not considered the immediate issue in relation to either of these two statutory schemes.

■ In our examination of the provisions of the North Dakota statutes governing securities and those governing franchises one significant distinction immediately becomes apparent. The franchise statute, Section 51–19–12, N.D.C.C., provides that any person who violates the provisions of Chapter 51–19 shall be liable to the franchisee who "may bring an action ... for rescission, ..." Section 10–04–17, N.D. C.C., governing the remedies available for violation of our securities statutes, specifies that a contract made in violation of the securities statutes "shall be voidable at the election of the purchaser." Furthermore, that statute specifies the circumstances under which such actions may not be brought by the purchaser. No such language and provisions are included in the franchise statute on remedies, Section 51–19–12. The absence of such language and provisions in the franchise statute leads us to conclude

12. Limiting our discussion of this requirement, we shall assume that the franchise at issue is one within the definition of "franchise" found at N.D.C.C. Section 51–19–02(5). We shall also assume that an offer or sale of the "fran-

chise" as defined by N.D.C.C. Section 51–19–02(5) took place in North Dakota. Finally, we shall assume that a violation of a provision of Chapter 51–19 has occurred.

that the remedy of rescission provided by the statute is the ordinary remedy of rescission. This court has made it clear in the past that rescission of a contract is governed by equitable principles whether the object of a suit is in equity or an action at law. *Fedorenko v. Rudman*, 71 N.W.2d 332 (N.D.1955).

Our view of this matter is reinforced by decisions developed by courts in other jurisdictions. The Minnesota Supreme Court has dealt directly with Minn.Stat.Ann. Section 80C.17, the counterpart of N.D.C.C. Section 59–19–12, allowing for rescission of a franchise agreement. *Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868 (Minn. 1978). However, in that case the Minnesota court was not faced with the precise issue we now contemplate. In *Martin Investors*, the plaintiffs, within eight months of signing the agreement at issue, brought an action to rescind under Minn.Stat.Ann. Section 80C.17 for failure to register. The defendants responded by asserting that the agreement at issue was not a "franchise agreement" as defined by the franchise Act and that no offer or sale had been made in Minnesota and thus the matter fell outside the jurisdictional requirements of the Act. Nowhere in that case is there any indication that the defendants attempted to raise any other defenses. The Minnesota court found that the agreement at issue was a franchise agreement within the meaning of the Act, that an offer and sale had been made in Minnesota, and that the plaintiffs were entitled to the remedies afforded by Minn. Stat.Ann. Section 80C.17.

Another Minnesota case, this one dealing with securities, has considered the essence of the issue before us. In *Logan v. Panuska*, 293 N.W.2d 359 (Minn.1980), the court held that an action to rescind under Minn. Stat.Ann. Section 80A.23 (which resembles Section 51–19–12, N.D.C.C., in that it does not provide that the contract is voidable at the option of the purchaser) does not carry

with it an automatic bar to the equitable defense of estoppel. The court concluded that a sale of securities in violation of registration requirements renders the sales agreement voidable rather than void. The court reasoned that only voidable contracts can be ratified or confirmed and that the Legislature never would have intended to invalidate all sales contrary to the securities laws because purchasers would then be precluded from enforcing the sale where it was a profitable venture free from fraud. The court went on to state:

> "We do not believe the void-voidable rule should prevent a court from acting fairly by applying equitable principles, nor do we believe the Blue Sky Law was meant to protect the investor from all of his errors of business judgment no matter how unrelated to, or distant from, the sale of unregistered securities." *Logan, supra*, 293 N.W.2d at 363.

From this reasoning the court concluded that the application of equitable principles to a claim for rescission under the Blue Sky Law necessarily swung the door open for a defendant to raise equitable estoppel as a defense.[13] In *Logan* the fact situation bears some similarities to the fact situation in the case now before us. The sellers of the securities had not registered those shares in accordance with the law. It is undisputed here that CKWA did not register the franchise in North Dakota. In *Logan* the investors entered into the transaction fully aware of the financial condition of the business in which they were purchasing stock. The *Logan* investors, like the plaintiffs in the present case, did not claim at any time that the defendants had misrepresented the financial condition of the business. In addition, the *Logan* investors, like Clark and Grose here, were heavily involved in the day-to-day operations of the investment object. In *Logan* approximately a year after their original investment and with knowledge that the restaurant-

---

**13.** This case does not represent the first time that the Minnesota court has applied equitable principles to an action based on a violation of the State's securities laws. In *McCauley v. Michael*, 256 N.W.2d 491 (Minn.1977), that court held that where a purchaser of unregistered stocks is in pari delicto with the seller regarding the violation, the purchaser is precluded from rescinding under Minn.Stat.Ann. § 80A.23.

lounge business which they had invested in was then in financial trouble, the investors purchased additional stock in the business. In the present case, subsequent to entering into the franchise agreements involving the three Peck Country Kitchens and with full knowledge that, in Washington, Country Kitchen restaurants were not enjoying a solid reputation, the plaintiffs invested in a fourth Country Kitchen. Regarding the time just prior to the purchase of the Ferndale Country Kitchen, Clark stated in his deposition:

"At that time most of the Country Kitchen restaurants in Washington were closed. I think there were only perhaps six left in the whole state and it was just common knowledge that those restaurants that had closed had just become insolvent and closed up and—well, it was just—everybody out there knew that Country Kitchen had a bad reputation, a bad image and that was it."

One distinction between these two cases is that while the plaintiffs in *Logan* waited to bring the action to rescind until after the business in which they invested had completely failed, the plaintiffs here initiated this action while the businesses were still operating profitably.

At almost the same time the Minnesota court was deciding *Logan, supra*, the Iowa Supreme Court was considering an identical issue. *Midwest Management Corporation v. Stephens*, 291 N.W.2d 896 (Iowa 1980). Noting that the doctrine of equitable estoppel is founded on "principles of morality and fair dealing and is intended to subserve the ends of justice" [291 N.W.2d at 907], the court went on to point out that it had applied that doctrine in a variety of circumstances, and cited instances where it had applied it to estop a party from relying upon a statute which was enacted to protect the class of persons to which that party belonged. In overruling summary judgment for the parties asserting the Blue Sky Law violations, the court held that those parties had not established the absence of fact issues regarding whether or not they should be estopped from asserting the violations.

Federal courts have held that equitable defenses are available to defendants in actions for rescission involving unregistered securities under the Federal securities laws. In *Straley v. Universal Uranium & Milling Corp.*, 289 F.2d 370 (9th Cir. 1961), the Court, in considering the Federal Securities Act, stated that estoppel and waiver "are available to one against whom an action at law is brought on a contract declared voidable at common law. On principle, we see no reason why such defenses would not likewise be available to one against whom an action is brought on a contract declared voidable by judicial construction of a statute." 289 F.2d at 373.

We agree with the reasoning employed by the Minnesota and Iowa courts as well as the Ninth Circuit regarding the application of equitable principles to actions involving the construction of securities statutes similar to our franchise statutes. (In so doing we do not imply that equitable defenses may be raised against a purchaser of securities under the particular provisions of Section 10–04–17, N.D.C.C., which we have already distinguished from the provisions of Section 51–19–12, N.D.C.C.) We find no sound reason why equitable defenses should not be available to a defendant in a case such as the one before us. We are not inclined to conclude, as the plaintiffs have here urged, that simply because rescission appears in a statute as a remedy available to the purchaser of a franchise sold in violation of the franchise laws it should be treated in a summary fashion and without consideration of equitable principles. We therefore conclude that, at a minimum, before a franchisee may rescind a franchise agreement under N.D.C.C. Section 51–19–12, he must overcome any equitable defenses raised by the franchiser.

In light of our conclusion that a franchiser being sued by a franchisee for rescission under N.D.C.C. Section 51–19–12 may raise equitable defenses, we now turn

back to the central question in this appeal. That question, whether or not there exists an issue of material fact which precludes summary judgment, may be quickly disposed of in that there are material-fact issues relating to the equitable defenses CKWA attempted to raise below which must be determined.[14]

For the above reasons we believe that the plaintiffs' motion for summary judgment was inappropriately granted and we remand the case for trial.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.

14. We point out also that CKWA claims the franchise law of North Dakota is inapplicable to the determination of this case because the jurisdictional requirements of N.D.C.C. Section 51–19–03 have not been met. Under that section a franchiser may not be held civilly liable for a violation of this State's franchise law unless the franchise at issue was offered or sold, as those terms are defined by N.D.C.C. Section 51–19–02(14), by the franchiser in the State. In its opposition to the plaintiffs' motion for summary judgment, CKWA, with particular emphasis on the events leading up to the execution of the first Peck franchise agreement, attempted to demonstrate that the Minnesota franchise law should control. On the other hand, the plaintiffs allege that the jurisdictional requirements of the North Dakota franchise law had been met and therefore North Dakota law should apply. We believe the question of whether or not CKWA, in violation of this State's franchise law, offered or sold franchise agreements in North Dakota is a question of material fact which also precludes summary judgment. We point out, however, that we believe that the application of either North Dakota or Minnesota law to the issues here involved requires that the defendants be allowed to raise equitable defenses.

CKWA presented an alternative argument below urging that the franchise law of Washington should be applied in this case. CKWA urges that the law favors the application of a law which would validate a contract, and validation of the franchise agreements would result if the Washington law were applied. However, it has neither been claimed nor concluded in this case that the franchise agreements at issue are invalid. Thus this argument by CKWA is without merit.