FARGO BILTMORE MOTOR HOTEL CORPORATION, a North Dakota Corporation, and John C. Olness, Plaintiffs,

v.

BEST WESTERN INTERNATIONAL, INC., a/k/a Best Western, Inc., a/k/a Best Western International, a/k/a Best Western, Defendant.

Civ. No. A3–81–16.

United States District Court, D. North Dakota, Southeastern Division.

March 24, 1983.

David S. Maring, Cahill Law Office, P.A., Moorhead, Minn., for plaintiffs.

Kermit E. Bye, Vogel Law Firm, Fargo, N.D., for defendant; Jerry C. Bonnett, Evans, Kitchel & Jenckes, Phoenix, Ariz., of counsel.

## MEMORANDUM OF DECISION AND ORDER FOR JUDGMENT

BENSON, Chief Judge.

This is an action in which Fargo Biltmore Motor Hotel Corporation and John C. Olness have pleaded claims against the defendant grounded on allegations of violation of North Dakota franchise laws and breach of contract. Plaintiffs seek damages, rescission and restitution. Defendant has counterclaimed for monies owed for services rendered and equipment rental, plus interest.

## FINDINGS OF FACT

Fargo Biltmore Motor Hotel Corporation (Fargo Biltmore) is a North Dakota corporation with its principal place of business at Fargo, North Dakota. Plaintiff John C. Olness is a citizen of the State of Minnesota and, at the time this action was filed, was the majority shareholder of the Fargo Biltmore. Defendant Best Western International, Inc., a/k/a Best Western, Inc., a/k/a Best Western International, a/k/a Best Western (Best Western) is a nonprofit membership corporation organized and existing under the laws of Arizona. It does not itself own, operate or lease any lodging properties. All properties in the Best Western chain are owned, operated or leased by Best Western members. Only owners, lessees or operators of hotels, motels or resorts may be Best Western members.

The Fargo Biltmore became a Best Western hotel in 1965. On or about December 22, 1978, Olness purchased approximately 95% of the stock in the Fargo Biltmore. Prior to purchasing the stock he was informed by Cathe Pribula, Best Western's membership supervisor that because Best Western's bylaws call for an automatic termination of membership when 50% or more of the stock in a corporation which owns an affiliated property has been sold or transferred, it would be necessary for Olness to apply for membership within 30 days of the effective date of sale if Best Western services at the Fargo Biltmore were to continue without interruption.

Olness applied for Best Western membership in December 1978. However, he did not send the required affiliation fee until January 1979. After an inspection of the Fargo Biltmore by H.J. Feger, a Best Western Field Representative, the Board of Directors approved Olness' membership on a contingent basis. Olness was informed of the approval of his membership by a letter dated March 16, 1979 from Victoria C. Wilmeth, Director of Membership Administration. Wilmeth's letter clearly stated that in reviewing Olness' application and the inspection report filed by Feger, "the Board of Directors noted that certain deficiencies

do exist at the property. As a condition of their approval the Board has stipulated that the problems reported by . . . [Feger] must be corrected within 90 days."

Under Olness' ownership the Fargo Biltmore continued to employ Edward Rafferty as its general manager. Rafferty had been the general manager of the hotel since 1970, during which time the Fargo Biltmore had continuously been a Best Western hotel. Therefore, he was familiar with Best Western's method of operation, including inspections and quality assurance reports. Additionally, three representatives of the Fargo Biltmore attended a portion of a Best Western Orientation Seminar, at which they too became familiar with Best Western. Best Western provided Olness with a variety of materials to acquaint him with Best Western's policies and operations, including the current Best Western Operations Manual.

Although Rafferty did not accompany Feger on the March 3, 1979 inspection of the Fargo Biltmore, he did review the report. It was Rafferty's opinion that the deficiencies noted were reasonable. Olness discussed this inspection report with the head housekeeper, and his wife, who was assisting Rafferty in managing the hotel. Although aware of the deficiencies noted in Feger's report, Olness didn't feel that they were important. He knew that the Fargo Biltmore had been a Best Western hotel since 1965 and relied on this fact when he submitted his membership application and affiliation fee.

Because Best Western had given Olness 90 days to correct the deficiencies in the March 3 Prospect Inspection Report, another inspection of the property was done by Feger on June 19, 1979. Feger consulted Rafferty about this report and a copy of it was left with Rafferty. Many of the same deficiencies are noted on the June 19 report as were noted on the March 3 report. Additionally, the property's maintenance and housekeeping score had decreased by 28 points. At Feger's request, Rafferty prepared a statement itemizing improvements made, major items on order and planned improvements. The list prepared dealt with improvements to areas not contributing to the major point losses in the inspection reports, and therefore not areas that Best Western felt deserved immediate attention.

On July 11, 1979 a letter was sent to Olness by Lynn E. Jackson, Best Western's Quality Control Manager, noting the continued existence of deficiencies at the Fargo Biltmore and the decrease in the housekeeping and maintenance score. Jackson reminded Olness that "[m]embership was granted for your property . . . with the condition that deficiencies noted on the March inspection report would be corrected in 90 days." It was Jackson's opinion that although many projects to upgrade the property had been started or planned, that an additional 90 days was needed to bring the property up to Best Western standards. Therefore, a reinspection of the property would be conducted in approximately 90 days from the date of the letter. A copy of Feger's report was enclosed with Jackson's letter. The areas to which Fargo Biltmore was to pay particular attention were circled in red.

After receiving this letter, employees of the Fargo Biltmore were instructed to do some of the repairs and improvements required by Best Western. Additionally, projects were undertaken and improvements made in areas not required by Best Western.

On October 12, 1979 Feger returned to the Fargo Biltmore to conduct a third inspection of the property. In his report Feger noted many of the same deficiencies as were noted in the two previous inspection reports. A copy of the Quality Assurance Report was left with Jerald A. Danner, the new general manager of the Fargo Biltmore. The October 12 report noted an improvement in the housekeeping and maintenance category (up from 780 points to 829 points) but also showed a failure to correct many of the problems specified in the previous inspections which had led to the Fargo Biltmore's contingency status.

Olness received another letter from Jackson, after the October 12 inspection. Jack-

son noted that some of the previous deficiencies had been corrected and commended Olness in this regard. However, Jackson stated that the Fargo Biltmore's contingency status was being extended an additional 90 days, due to deficiencies that continued to exist, and a score of less than 1000 on the mandatory section of the report. A copy of Feger's report was enclosed with Jackson's letter and Olness was again reminded that the items which Best Western felt merited immediate attention were circled in red. Additionally, Olness was invited to inquire about the report if he had any questions regarding it. Olness, however, made no inquiry.

The Fargo Biltmore was next inspected on January 28, 1980 by Best Western Field Representative Jack H. Hagy. In his report Hagy noted many of the same deficiencies as had been noted in the three previous inspection reports. A copy of the report was left with Danner.

Olness' next communication with Best Western was by a certified letter from Victoria Wilmeth dated March 3, 1980. The letter stated that Olness' membership for the Fargo Biltmore had been granted almost one year earlier with the understanding that a number of deficiencies at the property were to be corrected within 90 days. The letter noted that the Fargo Biltmore had scored below the acceptable level on the most recent inspection and that in addition to continued deficiencies, the report indicated the development of new problems. Wilmeth indicated "in its present condition the Best Western Fargo Biltmore Motor Hotel is reflecting negatively on the delicate reputation of the entire Best Western Chain," and that the by-laws listed this as a potential grounds for the cancellation of membership.

To ensure that Olness understood the deficiencies that Best Western believed were contributing to the overall problem, Wilmeth itemized them. Wilmeth's letter concluded with the following:

> Before making a decision as to what action should be taken as a result of the situation found at the Best Western Far-

go Biltmore Motor Hotel, we would like to hear your comments on the matter. The Best Western Rules and Regulations permit you 15 days in which to respond via certified mail. We would like you to indicate whether you agree or disagree with the list of deficiencies and what actions, if any, you plan to take. If your plans include corrective action, you will have a maximum of 30 days from the date of this letter to rectify the problems mentioned above.

It was after receiving this letter that Olness decided to turn the matter over to his attorney, David Maring. Maring responded by writing a letter to Wilmeth in which Maring stated that neither Olness nor Danner were aware that the Best Western membership was conditional upon any types of changes to the property or that two extensions in this regard had been given to the Fargo Biltmore. Additionally Maring responded to the itemized list of deficiencies contained in Wilmeth's March 3, 1980 letter. In Olness' opinion, Maring's itemized response to the deficiencies noted by Best Western set forth plans for correcting the problems within thirty days. Maring's letter indicated that some of the deficiencies noted by Best Western were to be remedied within two weeks. However, Maring's response to a number of the items was to disagree, on behalf of the management of the Fargo Biltmore, with a number of the deficiencies complained of, and to state that some of the improvements would be made at some indefinite time in the future. Maring's letter also noted several improvements not requested by Best Western and stated that "[i]t would seem to be in the best interests of all concerned if Best Western International work together with the Fargo Biltmore to continue the operation of this Best Western Motel in the City of Fargo."

In addition to responding to Wilmeth's letter, Maring contacted the North Dakota Securities Commissioner's office by telephone and spoke with Franchise Examiner Colleen Schweigart. Maring inquired of Schweigart whether Best Western was reg-

istered to sell franchises in North Dakota. After informing Maring that Best Western was not registered, Schweigart sent an inquiry complaint letter to Best Western asking them for information from which the Securities Commissioner's office could determine whether or not a franchise had been sold.

No further action was taken with regard to Olness' membership until the next inspection of the property by Hagy on June 3, 1980. This inspection revealed that although housekeeping at the hotel had improved, many other serious problems were evident. Hagy discussed his report with Danner before leaving the property. A copy of the report was left at the property and Olness reviewed it. Olness received a certified letter regarding the results of the inspection from Victoria Wilmeth. Wilmeth's letter indicated that the matter was so serious that it would be referred to the Board of Directors and that if Olness desired a hearing before the Board in order that he might show cause why his membership should not be cancelled, it would be necessary for him to request one within 30 days. Olness, through Maring, requested a hearing before the Board. Additionally, Maring kept Best Western informed of ongoing repairs to the property.

A hearing was set for August 28, 1980 in Pennsylvania. Prior to the hearing another inspection of the property was made on August 21, 1980. The report prepared by Field Representative Lewis Caballero noted many of the same deficiencies as noted in the earlier reports. Caballero discussed the inspection report with Danner and Olness. After Olness' appearance before the Board on August 28, the Board of Directors voted to cancel Olness' membership. Olness was notified of the Board's decision by letter dated September 5, 1980. Olness did not petition for a rehearing.

On September 11, 1980 Maring contacted Debi Wesson, director of Best Western's Membership Administration, and informed her that the North Dakota Securities Commissioner had determined that Best Western was an illegal franchise. He asked for reconsideration of the cancellation decision and threatened suit only if the decision were not reversed. The decision was not reversed and this action was commenced December 19, 1980. Olness seeks to recover $22,713.79, an amount equal to the sum of all monies paid to Best Western, plus $547.98 representing his costs for attending the cancellation hearing, plus his attorneys' fees. Best Western has counterclaimed for $6,614.39, monies owed for services rendered to the Fargo Biltmore, five months rent on Best Western's computer reservations equipment, totaling $925.00, plus attorneys fees and interest under the terms of the membership agreement. The case was tried to the court commencing on September 7, 1982. The trial lasted four days. After the submission of post trial briefs, the court took the matter under advisement on October 25, 1982.

## APPLICABLE LAW

### A. Alleged Franchise Law Violations

Plaintiffs allege that Best Western violated North Dakota franchise laws. Best Western denies that the franchise law has any application in this case, alleges that plaintiff's franchise law claims, if any, are barred by their inability to overcome Best Western's equitable defenses, and claims that the North Dakota Franchise Investment Law is unconstitutional.

The North Dakota Supreme Court on at least two occasions has interpreted various provisions of the North Dakota Franchise Investment Law, North Dakota Century Code chapter 51–19. In *Country Kitchen of Mount Vernon, Inc. v. Country Kitchen of Western America, Inc.*, 293 N.W.2d 118 (N.D.1980), the court held that because the legislature has expressly provided exclusive remedies in the franchise investment act for violations of the act, and automatic invalidation of the contract is not among the remedies, the failure of a franchisor to register under the franchise law does not make void a contract between the franchisor and the franchisee. *Id.* at 121. Additionally the court has held that the remedy of rescission provided by the franchise law is the

ordinary remedy of rescission, and that at a minimum, before a franchisee may rescind a franchise agreement under the franchise law remedy statute, he must overcome any equitable defenses raised by the franchisor. *Peck of Chehalis v. C.K. of Western America, Inc.,* 304 N.W.2d 91, 98–100 (N.D.1981). Plaintiffs in this case seek rescission and damages under the North Dakota Franchise Investment Law. Therefore, it will be necessary for this court to consider the scope, purpose and applicability of the franchise law only if plaintiffs prove their damages and Best Western's equitable defenses are not dispositive of the case.

It is the opinion of this court that plaintiffs have failed to prove damages and to overcome Best Western's equitable defenses. In Count I of their complaint, the count in which violations of the franchise investment law are alleged, plaintiffs seek damages connected with the application, membership and termination of membership in the amount of $5,000. However, plaintiffs presented no evidence at trial to support their damage claim. They presented no proof as to the fact of damage or the amount of damages, if any. Therefore, plaintiffs are not entitled to the recovery of damages on their franchise law claim.

In its answer to plaintiffs' complaint Best Western raised the equitable defenses of waiver, estoppel and laches. Additionally Best Western contends that plaintiffs' equitable claims are barred by their failure to restore Best Western to the status quo ante.

Plaintiffs and their attorney became aware of the circumstances giving rise to their claim for rescission in March 1980, when Maring was informed by Franchise Examiner Colleen Schweigart that Best Western was not registered to sell franchises in North Dakota. However, they elected to continue receiving and paying for services rendered by Best Western under the membership agreement. Even when Olness learned in June 1980 that Best Western was considering cancellation of his membership, he still did not seek to rescind. As a result Best Western sent reservations and other services to the Fargo Biltmore for an addi-tional two months. Olness has not yet paid for these services. Only after Olness' membership was cancelled and Best Western refused to reinstate him did plaintiffs demand restitution.

Waiver has been defined by the North Dakota Supreme Court to be "the voluntary and intentional relinquishment and abandonment of a known existing right, advantage, benefit, claim or privilege which, except for such waiver, the party would have enjoyed." *Gajewski v. Bratcher,* 221 N.W.2d 614, 628 (N.D.1974). Waiver can occur by conduct inconsistent with the assertion of the known right or claim, or by express statement. *See Beck v. Lind,* 235 N.W.2d 239 (N.D.1975).

Plaintiffs in this case clearly acted in a manner inconsistent with rescission of the membership agreement. After learning that Best Western was not registered to sell franchises in North Dakota, Olness and the Fargo Biltmore continued to receive and accept services and membership benefits from Best Western. Additionally, plaintiffs paid for these services for several months. In addition to their waiver by conduct, by requesting that the membership not be terminated, Maring, on behalf of plaintiffs, expressly affirmed the agreement. Therefore, plaintiffs waived their right to rescind the membership agreement.

Likewise, plaintiffs are equitably estopped to demand rescission. The elements of estoppel, as recited by the North Dakota Supreme Court, are as follows:

[T]he basic elements of an equitable estoppel, insofar as it relates to the person being estopped, are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct will be acted upon by, or will influence, the other party or persons; and (3) knowledge, actual or constructive, of the real facts. Insofar as related to the party

claiming the estoppel, the elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon, of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.

*Farmers Cooperative Ass'n of Churchs Ferry v. Cole,* 239 N.W.2d 808, 813 (N.D.1976) quoting *Annot.,* 56 A.L.R.3d 1037, 1041 (1974).

On the basis of the foregoing it is the opinion of this court that plaintiffs are estopped to demand restitution. In March 1980 when it first became apparent that Best Western was seriously considering cancelling Olness' membership, plaintiffs' attorney wrote Best Western urging that Olness' membership not be cancelled and stating that improvements at the Fargo Biltmore continue on a day to day basis. Maring's letter also stated that he thought it would be in the best interests of all concerned if Best Western continued to work with the Fargo Biltmore.

At the same time that Maring was representing to Best Western that Olness desired to remain a Best Western member, he was also in contact with the Securities Commissioner's office regarding Best Western's nonregistration. While the Securities Commissioner's office communicated with Best Western on numerous occasions, Best Western was never informed that Maring was urging the Commissioner to take action against Best Western, or that the initial inquiry into Best Western's registration status had come from Maring.

Best Western, relying upon Maring's representations that daily improvements were being made at the Fargo Biltmore and that it was Olness' desire to remain a member, withheld taking any further action to cancel Olness' membership. Best Western continued to send reservations to the Fargo Biltmore, permitted the hotel to continue using Best Western's name and logo, and continued to provide other membership benefits to the Fargo Biltmore.

The June 3 inspection report, however, revealed that the Fargo Biltmore had not yet made the necessary repairs, even though Olness had represented that he wished to remain a Best Western member and would therefore take steps to improve the housekeeping and maintenance at the Fargo Biltmore. Best Western justifiably relied upon Olness' and Maring's representations and continued to provide Olness with the benefits of membership. Because Olness and the Fargo Biltmore took full advantage of these benefits which can not be returned, and which plaintiffs have refused to pay for, plaintiffs are now estopped from claiming rescission of the agreement and restitution.

■ Additionally, plaintiffs' failure to restore Best Western to the status quo ante bars rescission. The North Dakota Supreme Court has declared that the rescission remedy provided by the franchise investment law is the ordinary remedy of rescission. *Peck of Chehalis v. C.K. of Western America, Inc.,* 304 N.W.2d at 99. In order to invoke the ordinary remedy of rescission in North Dakota it is necessary that the party seeking rescission return or offer to return to the other party everything of value which he has received from him. *See* N.D.Cent.Code § 9–09–04; *Fekjar v. Iowa State Live Stock Ins. Co.,* 44 N.D. 389, 177 N.W. 455 (1920); *McMahon v. Plummer,* 6 Dak. 42, 50 N.W. 480 (1888). As membership benefits Olness and the Fargo Biltmore received Best Western's services, tradename and trademarks, logo and reservation equipment. Upon being advised of Olness' membership termination, the Fargo Biltmore discontinued the use of Best Western's name and logo design. The Best Western crown sign was removed from the property by Best Western, and the Fargo Biltmore no longer carried on any activity as a Best Western affiliated property. However, Olness did retain possession of Best Western's Star Terminal for several months.

■ Plaintiffs apparently believe that because the Fargo Biltmore failed to show a

profit during the period that Olness was a member of Best Western, they had nothing more than the above mentioned items to return before invoking the remedy of rescission. It is true that neither Olness nor the Fargo Biltmore can return the services and benefits received while Olness was a Best Western member. However, this fact does not relieve plaintiffs from returning or offering to return the value of the services before any right to rescission might be had. Olness' desire to remain a Best Western member is evidence that he recognized that the benefits and services provided to members are indeed valuable.

Because they have failed to prove damages, and have failed to overcome Best Western's equitable defenses, plaintiffs are precluded from rescinding the membership agreement and seeking restitution under the North Dakota Franchise Investment Law.

### B. Breach of Contract

█ This claim requires but little additional discussion. The evidence makes it clear that Olness' membership was contingent upon a number of repairs and improvements being made at the Fargo Biltmore. This fact was communicated to Olness and/or the management of the Fargo Biltmore on numerous occasions, beginning with the letter of acceptance itself. The necessary improvements and repairs were specifically enumerated in the inspection reports, copies of which were either left at the Fargo Biltmore or mailed to Olness after the inspections. While contingent membership was not provided for in the membership agreement signed by Olness, Olness manifested his consent to such a condition when he accepted and paid for Best Western services and benefits.

Because improvement of the Fargo Biltmore was a condition of Olness' membership, by failing to do the needed repairs or to improve the maintenance and housekeeping, Olness and not Best Western was the one that breached the membership agreement. Additionally, Olness breached the Star Terminal Agreement when his membership was terminated and he refused to permit return of it to Best Western. Therefore, Best Western acted within its rights under its contract with Olness when it cancelled Olness' membership and sought return of its property.

### CONCLUSION

Plaintiffs are entitled to no relief under the North Dakota Franchise Investment Law because they have failed to overcome Best Western's equitable defenses. The termination of Olness' membership by Best Western on September 5, 1980 was a valid exercise of Best Western's rights under the membership agreement. Defendant Best Western is entitled to a dismissal of plaintiffs' complaint and cause of action, and is further entitled to recover from John Olness and the Fargo Biltmore on its counterclaim.

### ORDER FOR JUDGMENT

IT IS ORDERED that judgment be entered:

1. for the dismissal of plaintiffs' complaint and cause of action;

2. for defendant in the amount of $7,539.39, being $6,614.39 for goods and services delivered, and $925.00 for wrongful detention of computerized reservations system equipment for five months, plus prejudgment interest on $7539.39 at the rate of six percent per annum from December 1, 1980 to date of entry of judgment;

3. for defendant for costs. Attorneys' fees are not awarded.