**A.L. MARTSCHINSKE, and Dakota Recreational Vehicles, Inc., Plaintiff,**

v.

**OLYMPIC STYLES, INC., and Frank S. Kovach, and Attila Kovach, Defendants.**

**Civ. No. 81–1020.**

United States District Court, D. South Dakota, N.D.

Dec. 26, 1984.

Harvey Oliver, Bantz, Gosch, Cremer & Peterson, Aberdeen, S.D., for plaintiff.

Ronald G. Schmidt, Schmidt, Schroyer, Colwill & Zinter, Pierre, S.D., for defendants.

## MEMORANDUM OPINION

DONALD J. PORTER, Chief Judge.

### CASE SUMMARY

Plaintiff was involved in a franchise agreement with defendants. Defendants terminated the agreement, and plaintiff sued for rescission. The court finds, after a bench trial, that plaintiff is not entitled to rescission, but that judgment must be entered against plaintiff on defendants' counterclaim for fees owing under the agreement.

### FACTUAL SUMMARY

The facts underlying this diversity action span most of the 1970's. Plaintiff,[1] who at most times pertinent here was a trooper with the South Dakota Highway Patrol, began a part-time retail dealership in Aberdeen, South Dakota in 1971 in the sale of tent campers.[2] In 1972 or 1973, he also started to sell pickup caps or toppers,[3] eventually selling 100 to 150 of these during the course of his dealership. In 1975, plaintiff began selling toppers made by defendants in their manufacturing plant in Elkhart, Indiana.

After initially buying defendants' caps from defendants' dealer-distributor in Fargo, North Dakota, plaintiff, in September, 1975, drove directly to Elkhart for a load of the caps. While in Elkhart, plaintiff met with defendant, Frank Kovach, the vice president of defendant Olympic Styles, Inc., and the originator of defendants' line of products. It is a matter of dispute as to which of the parties was the initiating force, but during that meeting and for several succeeding months, plaintiff and defendants discussed a proposal that plaintiff establish a plant in South Dakota for the manufacture and sale of defendants' caps in a franchise area encompassing most of the Western United States and Canada.[4] The parties also discussed possible sources of financing for plaintiff's plant. By January 5, 1976, the basic outlines of the agreement had already taken shape, as embodied in a letter Frank Kovach sent that day to plaintiff. Attached to this letter were three pages of projected costs and profits of a cap manufacturing operation, which indicated a yearly profit of $122,993 on sales of 2880 caps at $884,160. The only reference in the letter itself to these projections was the sentence, "Based on our data enclosed with this letter, have your CPA fill out the SBA form: 'Estimated projection and forecast of two year's earnings.' "

---

1. For the sake of clarity, "plaintiff" throughout this opinion shall mean plaintiff A.L. Martschinske, although Martschinske's corporation, Dakota Recreational Vehicles, is also joined as a plaintiff.

2. A tent camper is on wheels and towed behind a vehicle.

3. A cap or topper is mounted on the box of a pickup truck.

4. Any reference to a "franchise area" in this opinion shall be taken to mean the franchise area proposed to be under plaintiff's control.

Frank Kovach sent plaintiff a second letter on January 8, 1976, enclosing several pages of inquiries about defendants' caps from dealers in the proposed franchise area that were stated to have come "in as a result of our national advertising, and direct mailings. We have already sent them literature and price lists. All they need is to see our product to buy it." Defendants sent plaintiff a draft franchise agreement in March, 1976, and plaintiff retained an attorney to examine it, who suggested a number of changes.

Plaintiff experienced difficulties in locating a building for his plant and in obtaining financing, so the franchise proposal essentially lay dormant for many months. Frank Kovach sent plaintiff a letter on November 28, 1977, noting the plaintiff complained he did not have enough dealers to start a business. Kovach observed that he had had no dealers when defendants' business opened, but that they had managed $864,784 sales in the first year, $1,640,604 sales in 1975, $2,699,947 sales in 1976, and an expectation of slightly higher sales in 1977. Kovach stated that:

> In our designated area we have not made an effort to establish dealers. It is not a prime delivery area for us, and for this reason we would rather franchise the area or open a plant ourselves. We honestly expect you to sell over a million dollars in the first year. Don't forget—you are sharing in our experience, dealers, dealer and retailing inquiries, advertising, and established name.

An attachment to this letter stated that, "We have a total of 34 dealers in that area, at the present time. Sales in that area for 1976 were 934 for $294,461.02."

In March, 1978, plaintiff went to Elkhart for further discussions with defendants about the franchise. Among other things, plaintiff asked for, and received, the addition of Canada to the franchise area. At about this point in time, plaintiff had finally found a manufacturing site, in Ipswich, South Dakota, had received financing, and resigned from the Highway Patrol.

On April 20, 1978, the parties signed an agreement. The agreement provided that defendants allowed plaintiff to use the defendants' cap designs, production techniques, and the names "Olympic" and "Olympic Style". Plaintiff had exclusive rights to manufacture and sell the caps within the franchise area. Defendants agreed to instruct three of plaintiff's employees for one week in manufacturing, management and marketing, to provide lists of "all existing and future dealers, sales representatives and inquirers" in the franchise area, and to assist plaintiff in the initial setup of plaintiff's Ipswich operations for one week, with plaintiff paying "all expenses, including air fare to and from Elkhart, Indiana to Ipswich, South Dakota, lodging, food and incidentals."

Plaintiff, who paid $18,500 as a fee for the agreement, undertook to purchase all manufacturing supplies either from defendants or sources approved by defendants; to employ a Certified Public Accountant, to furnish defendants with weekly labor costs and gross sales reports, quarterly profit and loss statements, balance sheets, to pay defendants a two percent fee on gross sales in the United States, and a three percent fee on Canadian sales. Plaintiff also agreed to take out public liability and product liability insurance, and to give defendants a copy of the insurance policies.

Paragraph 16 of the agreement provided that, in the event of a breach of the agreement, "unless some condition or conditions are remedied to the satisfaction of [defendants] within ninety (90) days after written notice thereof has been given ... [defendants] may terminate this agreement and all rights of the [plaintiff] hereunder shall cease."

In June, 1978, plaintiff and two of his employees went to Indiana for two weeks of the training described in the agreement. Plaintiff testified at trial that he was allowed access to all phases of defendants' operations, and that he received about 150 hours of instruction. Plaintiff also testified that he sometimes telephoned defendants' plant for help, and while he might

have been unable to contact either of the Kovachs, he would get help from defendants' employees. Defendants also sent one of their employees to help plaintiff set up his plant in Ipswich, although plaintiff was obliged to pay—as provided by the contract—this person's expenses. Plaintiff complained that the individual sent was qualified only to make wood-panel caps, but plaintiff also admitted that there was little difficulty in making aluminum caps. Defendants did add plaintiff's name to some of their advertising.

Plaintiff, once his plant began operating, began making sales in January, 1979, and testified that during the franchise period, he established about fifty dealerships. Plaintiff's 1978 income tax return, which was on a taxable year from April 1, 1978 through March 31, 1979, shows that between January and March, 1979, plaintiff had $74,157 in gross sales. Plaintiff, however, never paid defendants any of the weekly fees required on these sales. Plaintiff testified that he did telephone sales reports to defendants as to the sales, although this is disputed by defendants. Plaintiff admits that he made no reports as to labor costs, profit and loss statements, or quarterly balance sheets.

During plaintiff's production, he also apparently used a "skin" for the caps he manufactured that plaintiff purchased from a supplier named Elixer in New Ulm, Minnesota. It is disputed whether defendants approved the use of this supplier, or whether this "skin" was in fact defective. It is also disputed whether plaintiff changed the design and specifications of caps for imported pickups without defendants' authorization. At trial, defendant Attila "Tony" Kovach indicated that he was unsure what different design plaintiff had made. Plaintiff did have liability insurance in force, but never himself provided defendants with a copy of the policy. Plaintiff did indicate that he had instructed his insurance agent to send a copy of the policy to defendants, but did not know if such was ever done.

On May 25, 1979, after some telephone communications, defendants sent plaintiff a document entitled, 'Notice of Termination of License Agreement." This invoked Paragraph 16 of the contract, and stated that it was:

> your written ninety (90) day notice to you that you failed to perform and observe the following covenants with respect to your obligations to Olympic Style, Inc., Licensor, in the following respects, among others.
> 1. You used metal skin from a supplier who was not approved by us, thus causing quality problems in design and specifications.
> 2. Under Item 3, *Products*, the design and specifications of the foreign caps were changed without our approval.
> 3. Under *Accounting*, (a) and (b) we were not furnished with quarterly balance sheets, and under (c) we were not furnished with gross sales or prices.
> 4. No percentage of gross sales was ever sent to us.
> 5. No public liability or product liability insurance was ever provided for us.

Plaintiff did discontinue the use of defendants' name at some point after this letter. Plaintiff did, however, continue to manufacture at least some of the same models for an indefinite period of time.

Defendants at no time made any attempt to comply with the requirements of the South Dakota Franchise Act, SDCL 37–5A–1, et seq. Plaintiff, through his attorney, complained to the relevant state authorities of these violations in July, 1979.

## DISCUSSION

### *Plaintiff's Rescission Claims*

 Plaintiff's Amended Complaint, while less than artfully drawn, seems to make claims for the torts of fraud and deceit, for, apparently, both damages and rescission for violations of the South Dakota Franchise Act (hereafter "Franchise Act"), and for tortious breach of an implied obligation of good faith. While this could present an initial difficulty as to whether

plaintiff must now elect to pursue one of these claims to the exclusion of others,[5] it is clear from the many pleadings filed by plaintiff that plaintiff himself has chosen to pursue the rescission remedy to the exclusion of all other claims he may have had. *See, e.g.,* the concluding paragraph of Plaintiff's Post-Trial Brief at 17, in which it is requested that this court enter judgment "granting judicial recognition of the rescission of the franchise agreement and awarding to plaintiff restitution"; Paragraph 46 of Plaintiff's Proposed Findings of Fact requests recovery in terms of the "amount necessary to put [plaintiff] in the position that he occupied prior to the franchise agreement;" a "Reply Brief" filed by plaintiff on August 8, 1983 states that the "*only* remedy available to plaintiff is rescission and damages by way of restitution." (Emphasis in original). Plaintiff is obviously entitled to choose the legal theory he would pursue, and he has just as obviously chosen rescission here.

### Franchise Act Violations

■ It seems moderately clear that defendants may have violated several provisions of the Franchise Act, including SDCL 37-5A-6 (registration statement) and SDCL 37-5A-16 (application for registration).[6] It is also true that SDCL 37-5A-83 provides that a person violating these provisions "shall be liable to the franchisee ... who may sue for damages caused thereby, for rescission, or other relief as the court may deem appropriate." The issue of whether a violation of these formal requirements automatically renders a person liable under SDCL 37-5A-83 has apparently not been addressed in this state, but the court finds persuasive the interpretations made of the very similar North Dakota Franchise Act.

In *Country Kitchen of Mount Vernon, Inc. v. Country Kitchen of Western America, Inc.,* 293 N.W.2d 118, 120 (N.D.1980), the court held that "the Legislature [did not intend] franchise agreements to be void in their inception because the franchisor failed to register the offer." *See also Clapp v. Peterson,* 327 N.W.2d 585 (Minn. 1982); *Peck of Chehalis, Inc. v. C.K. of Western America, Inc.,* 304 N.W.2d 91 (N.D.1981). More significantly, this court is also persuaded that "the rescission remedy provided by the franchise investment law is the ordinary remedy of rescission." *Fargo Biltmore Motor Hotel Corp. v. Best Western International, Inc.,* 563 F.Supp. 1022, 1028, (D.N.D.1983), *aff'd.* 742 F.2d 459 (8th Cir.1984). This court finds that if the question was ever presented to the South Dakota Supreme Court, that court would adhere to the rule set forth in *Fargo Biltmore,* and find that a franchisee seeking rescission must comply with the established rules of rescission under South Dakota law.

■ Under SDCL 53-11-4, a "party rescinding a contract must rescind promptly, upon discovering the facts which entitle him to rescind, if he is free from duress, undue influence, or disability, and is aware of his right to rescind." SDCL 53-11-5 also provides that the "party rescinding a contract must restore to the other party everything of value which he has received from him under the contract, or must offer to restore the same, upon condition that such party shall do likewise, unless the latter is unable or positively refuses to do so."

Plaintiff seems to make no claim that he was suffering from duress, undue influence, or disability in July, 1979 when he discovered the Franchise Act violations.

---

**5.** It is at least clear that plaintiff may not bring a claim for *both* tortious deceit and a contract action for rescission. *Aschoff v. Mobil Oil Corp.,* 261 N.W.2d 120, 123 (S.D.1978). The wording of the Franchise Act, SDCL 37-5A-83, suggests that a franchisee may sue for *either* damages *or* rescission. *Martin Investors, Inc. v. Vander Boe,* 269 N.W.2d 868, 875-76 (Minn. 1978) tends to support this view. *But see Run-*

*yan v. Pacific Air Industries,* 2 Cal.3d 304, 85 Cal.Rptr. 138, 466 P.2d 682 (1970).

**6.** Plaintiff also claims that defendants violated SDCL 37-5A-43, prohibiting misrepresentation in the sale of franchises. The court, as demonstrated in the discussion of plaintiff's specific misrepresentation claims *infra,* finds no basis for this claim.

Nor can plaintiff argue that he was not aware of his right of rescission, since this court must infer that plaintiff's attorney informed plaintiff of his rescission rights under the Franchise Act at the same time the Franchise Act violations were discovered. Yet, plaintiff took no legal action against defendants until 1981, and did not advance a rescission theory against them until motion to file the Amended Complaint was filed on June 8, 1983. During most of this time period and, indeed, up to the time of trial, plaintiff indicated that he continued to manufacture at least some of the models he had been trained to produce by defendants, though plaintiff did stop using defendants' name. Plaintiffs at no time either during the time the contract was in force or afterward, attempted or offered to pay defendants the license fees due them for the sale of these models.

As the case of *Saunders v. Farmers & Merchants Nat. Bank of Milbank*, 61 S.D. 261, 248 N.W. 250, 252 (1933) stated, no "fixed rule can be laid down as to time in which one must rescind. What may be a prompt action in one case would not be so in another case." The facts of the *Saunders* case are, however, particularly instructive here. In *Saunders*, the plaintiff alleged misrepresentations as to the value of stocks received from defendants. Only a few days after receiving this stock, plaintiff had been advised it was worthless, yet for almost eighteen months plaintiff continued to accept and retain dividends from a portion of stock. On these facts, the court held that plaintiff had failed to act promptly within the meaning of the rescission statute. As *Saunders* stated, the "statute provides that after discovering the [facts upon which rescission is based] one must then rescind promptly. Failing to do so will deprive one of the right to rescind, although no prejudice or injury be shown as a result of the delay. Under the statute, promptness is made an imperative condition, without regarding the consequences on the other party." 248 N.W. at 252. As noted above, plaintiff delayed for nearly four years before moving to rescind the contract. Further, plaintiff continued to utilize the methods he had learned from defendants without paying defendants any fee for the use of these methods. Under these circumstances, the court must hold that plaintiff has failed to satisfy both the requirement of prompt rescission under SDCL 53-11-4, and the requirement under SDCL 53-11-5 that plaintiff must restore or offer to restore to defendants everything of value received under the contract.[7] No rescission remedy is therefore available to plaintiff for any Franchise Act violations.

The court also finds that were the question presented to the South Dakota Supreme Court, that court would also follow the lead of the North Dakota court and hold that "before a franchisee may rescind a franchise agreement ... he must overcome any equitable defenses raised by the franchiser." *Peck of Chehalis, Inc.*, *supra*, 304 N.W.2d at 100, including the defenses of estoppel and waiver. Under South Dakota law, a waiver exists where one in possession of any right, whether conferred by law or contract, and with full knowledge of the material facts, does or forbears the doing of something inconsistent with the existence of the right. *Western Casualty and Surety Co. v. American Nat.-Fire Insurance Co.*, 318 N.W.2d 126, 128 (S.D.1982). The facts marshalled

---

7. *See Fargo Biltmore, supra*, 563 F.Supp. at 1029: "It is true that neither Olness nor the Fargo Biltmore can return the services and benefits received while Olness was a Best Western member. However, this fact does not relieve plaintiffs from returning or offering to return the value of the services before any right to rescission might be had."

*Fargo Biltmore* also answers plaintiff's claim that defendants' plans to produce the caps, and the models themselves, are so simple as to have

no value. Plaintiff was an experienced cap dealer, and was familiar with defendants' caps as well as caps produced by other manufacturers. Yet, plaintiff chose to learn defendants' production techniques, and to produce defendants' caps when he was obviously at liberty to set up a plant without any franchise. Plaintiff's "desire to [become defendants' franchisee] is evidence that he recognized the benefits and services provided ... [were] indeed valuable." *Id.*

above in the discussion of SDCL 53–11–4 and 53–11–5, dealing with plaintiff's continued production of defendants' models after the termination of the contract are inconsistent with rescission of the contract, and constitute a waiver of any right to rescind the contract plaintiff may have had. *Fargo Biltmore, supra,* 563 F.Supp. at 1027.[8]

Although the foregoing would bar any rescission based on the other grounds advanced by plaintiff, and not just the claimed violations of the Franchise Act, the court will, for the sake of argument, briefly discuss each of these other claims, as they reached their final form in plaintiff's Post-Trial brief.

### Rescission by Consent

■ Plaintiff argues, pursuant to SDCL 53–11–2(5), that the contract was rescinded by consent of the parties under the termination letter of May 25, 1979. The evidence does not support this contention. The termination letter hardly rescinded the agreement between the parties; it affirmed the continued existence of the contract in its utilization of Paragraph 16, which imposed certain continuing obligations on plaintiff, including the cessation of the production of defendants' models. Further, plaintiff's continuing production of these models after the termination letter also does not suggest a mutual rescission. *See Ford v. Hofer,* 79 S.D. 257, 111 N.W.2d 214, 216 (1961): if rescission is evidenced "by acts alone they must be such as leave no doubt as to such intention."

### Misrepresentation

■ Plaintiff claims that defendants committed acts of "fraud, deceit and misrepresentation" entitling plaintiff to rescind under SDCL 53–11–2(1). By this blanket claim, plaintiff covers much diverse territory with little or no specificity as to what plaintiff does exactly claim. Deceit, a statutory tort under South Dakota law, is defined at SDCL 20–10–1, 20–10–2. Actual fraud, which "may be the basis of tort actions and contract actions", *Schmidt v. Wildcat Cave, Inc.,* 261 N.W.2d 114, 117 (S.D.1977), is defined at SDCL 53–4–5. Constructive fraud, which may be "the basis only for actions for the avoidance of contracts", *Schmidt, supra,* is defined at SDCL 53–4–6. Negligent misrepresentation is a common law tort in South Dakota law, and has been given its fullest treatment in the case of *Moore v. Kluthe & Lane Ins. Agency, Inc.,* 89 S.D. 419, 234 N.W.2d 260 (1975). While there are variations in the proof of each of these actions, there are certain common elements:

> First, there must have been a misrepresentation.... Second, the misrepresentation must have been either fraudulent or material.... Third, the misrepresentation must have induced the recipient to make the contract.... Fourth, the recipient's reliance on the misrepresentation must have been justified.

*Restatement of Contracts Second,* Chapter 7, Topic 1, Introductory Note.

Although the amended complaint sets forth a rather extensive list of alleged misrepresentations, the only alleged misrepresentation urged in plaintiff's Post-trial brief is the variance between the projections attached to Frank Kovach's letter to plaintiff of January 5, 1976, and the actual cost of business and profits set forth in defendants' tax returns for the years 1974–1977, which show a lower profit margin. The court does not find plaintiff's evidence on this issue persuasive. Initially, it is difficult to find that the information in the letter is meant as a representation of defendants' own business costs and profits,

**8.** Though it is ultimately of no help to plaintiff's position, the court must find defendants have no valid estoppel defense. To create an estoppel there must have been some act or conduct by the party estopped which has in some manner misled the party in whose favor estoppel is sought and has caused such party to do some act relying upon the conduct of the party to be estopped, thus creating a condition that would make it inequitable to allow the guilty party to claim what would otherwise be his legal rights. *L.R. Foy Construction Company, Inc. v. Spearfish School District,* 341 N.W.2d 383, 386 (S.D. 1983). The court perceives no indication of reliance by defendants on any of plaintiff's acts after the contract termination.

since the only statement in the letter relating to the projections indicates that it is "data" to give to a CPA for an application for a SBA loan. Frank Kovach, at trial, indicated that the information was based on general experience in the industry, and not necessarily on his own experience. Even if it could be assumed that plaintiff understood the projections as a representation of defendants' business and what plaintiff could expect, however, the record does not support a finding that plaintiff ever relied on the information.

Plaintiff admitted, for example, that he did not give the information to a CPA, and apparently did not use it in his SBA application. Plaintiff also admitted that he paid himself a higher salary than suggested in the projections, had two salesmen rather than the projected one, and paid workers at a different rate and on a different basis than projected (actually resulting in lower labor costs with more workers than the letter projected). In fact, plaintiff stated under cross-examination, in explaining why he did not follow the projections in his own business, that they "were in generalities anyway." Given this evidence of plaintiff's attitude toward the projections, the court is unable to find that he relied on the information to make the contract,[9] and any claim of misrepresentation, under any of its forms, must accordingly fail.

### *Failure of Consideration*

■ Under SDCL 53–11–2(2), (4), failure of consideration can be grounds for rescission. The evidence in support of this theory argued in plaintiff's Post-Trial Brief is defendants' sales in the franchise area after the signing of the contract. As noted *supra,* in the factual summary, these sales took place almost entirely before plaintiff even began production in November, 1978 and, of course, could make no sales himself. There were *no* sales of any significance by defendants in the franchise area in 1979, after plaintiff had begun his own sales. Plaintiff can point to no evidence in the record indicating any damage to him from the 1978 sales by defendants, beyond the bald claim that dealers had told plaintiff that defendants had "filled them up." The court accordingly cannot find that the unauthorized sales constituted a failure of consideration.

### *Breach of Obligation of Good Faith and Fair Dealing and Fiduciary Responsibility*

Plaintiff's source for a duty of good faith and fair dealing is *Restatement of Contracts Second,* § 205. The comments to this section indicates "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith.'" Bad faith is exemplified in the comments as "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."

Plaintiff's primary authority for the existence of a fiduciary duty between plaintiff and defendants is *Arnott v. American Oil Co.,* 609 F.2d 873 (8th Cir.1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1979). In *Arnott,* the court construed the South Dakota Franchise Act in terms of the relationship between an oil company and a service station dealer. *Arnott* states that "South Dakota law ... indicates that the franchisor and franchisee of a service station operation are involved in a fiduciary franchise relationship where-

---

**9.** Plaintiff's Proposed Findings of Fact also complains of the statement in Frank Kovach's letter of November 28, 1977 that "We honestly expect you to sell over a million dollars in the first year." In the same letter, Kovach sets forth the sales made by defendants in their first years of operation, ranging from $860,000 to $2,700,000, sales figures which were reasonably accurate, and also tells plaintiff the actual sales in the franchise area in 1976. The court finds nothing in this letter that is not essentially in accord with the facts. *Restatement of Contracts Second,* § 159.

by the parties should act with good faith toward each other." 609 F.2d at 883. The Eighth Circuit has itself limited the apparent scope of *Arnott*, in *Bain v. Champlin Petroleum Co.*, 692 F.2d 43, 48 (8th Cir. 1982): "Inasmuch as the duty of 'good faith and fair dealing' is inherent in every business relationship, it was unnecessary to the [*Arnott*] decision to label that duty as 'fiduciary'. In any event, *Arnott* does not stand for the proposition that the grant of a franchise of itself in all instances imposes on the franchisor *all* of the duties and responsibilities which traditionally pertain to a true fiduciary." (Emphasis in original). The court is of the view that *Arnott* is limited to its facts, and has little or no applicability here. Again, for the sake of argument, however, the court will consider the facts presented under the fiduciary standard set forth in *Arnott:* "the law requires that neither party exert undue influence or pressure upon the other, take selfish advantage of his trust or deal with the subject matter of the trust in such a way as to benefit himself or prejudice the other except in the exercise of the utmost good faith and with the full knowledge and consent of the other person involved." 609 F.2d at 881 n. 6.

Plaintiff, as evidence advanced for breaches of these standards in his Post-Trial Brief, points to defendants' alleged misrepresentations, defendants' unauthorized sales in the franchised area, defendants' alleged attempt to obtain kickbacks, defendants' alleged failure to provide assistance to plaintiff, and defendants' alleged wrongful termination of the agreement. The misrepresentations and unauthorized sales claims have already been considered, and even under the different standards under the law of good faith and fiduciary relationship, the court must reach the conclusion that no valid claim for rescission has been advanced on these grounds.

The court must note, in relation to the kickback allegation, that plaintiff has produced nothing but an unsworn offer of proof that one of plaintiff's suppliers would testify that a defendant approached the supplier and suggested a scheme in which the supplier would charge plaintiff higher prices in return for lower prices to defendants. No admissible evidence was ever introduced on this claim, although defendants did deny that the conversation took place. Even were this court to find that the attempt took place, which it does not, nothing came of it, and plaintiff was not damaged. A significantly different state of affairs would exist had such a scheme been carried out, but as the record stands, there is nothing in this allegation to justify rescission.

Plaintiff's argument that defendants failed to adequately assist plaintiff is without merit. Though plaintiff contends, in his proposed finding of fact number 17, that the two weeks of training at defendants' plant were insufficient, it must be noted that the contract provided for only one week of training. There is no indication that plaintiff could not have stayed for longer training had he so desired, and the plaintiff admitted that he returned to defendants' plant several times and was able to discuss matters with and get help from defendants' employees. Defendants also sent, pursuant to the contract, one of their employees to help set up plaintiff's plant. Plaintiff complains that he was required to pay this person's expenses and wages, but this requirement, which is not unreasonable, was clearly set forth in the contract.[10] Although plaintiff testified that he never asked that Tony Kovach come to South Dakota, plaintiff seems to argue that the fact Tony Kovach volunteered to come in

---

**10.** It might also be emphasized at this point that plaintiff, an experienced dealer in caps who was familiar with defendants' products, was represented by counsel during the time the contract was negotiated, and in fact, obtained several changes in the contract before it was finally signed. Given these circumstances, it can hardly be said that plaintiff was on unequal footing with defendants or did not understand his legal rights and the relevant facts. *See Restatement of Contracts Second,* § 173, comments a and b. *See also Kase v. French,* 325 N.W.2d 678 (S.D. 1982).

return for $1,000 a week somehow constitutes a failure to assist plaintiff. In view of the fact plaintiff never asked for the assistance and did not pay the requested fee, this claim is utterly without merit. Finally, plaintiff also seems to argue that defendants failed to give him assistance in making caps for import pickups and the El Camino. While there may have been some delay in supplying plaintiff with the import models, plaintiff admitted that he did receive the information for these caps from defendants' employees. Plaintiff never stated precisely the length of the delay in receiving the information; he did commence production of import caps during the franchise period. Plaintiff also introduced no evidence to counter defendants' assertion that research and development of the El Camino cap was not completed during the franchise period and that the defendants were therefore justified in not instructing plaintiff in its production. Plaintiff has therefore failed to prove his assertions that defendants did not provide the assistance due him, given their relationship under the franchise agreement.

■ The claim that the agreement was terminated wrongfully is absolutely without merit. The evidence is clear that plaintiff had violated the agreement in at least two of the respects specified in the May 25, 1979 termination notice: plaintiff admitted that he never, either orally or in writing, provided defendants his quarterly balance sheets, and plaintiff admitted that he never paid defendants their percentage of gross sales. Nothing in the contract gave plaintiff the option to forego these duties, and his failure to perform these duties was a significant breach of the contract, totally justifying its termination by defendants.

For all the reasons set forth above, therefore, the court must enter judgment against plaintiff on his claim for rescission.

### Defendants' Counterclaim

As the foregoing discussion makes clear, the court has found that the contract between the parties was valid. Accordingly, it is necessary to consider defendants' counterclaim for damages caused by plaintiff's breach of the contract. First, however, the court must consider plaintiff's argument that there is no pending counterclaim.

■ Defendants timely filed an answer and counterclaim to the original complaint. No answer and counterclaim was filed to the amended complaint, which itself was filed just prior to trial. The only change in the amended complaint was to alter the prayer for relief to reflect that the action was now one for rescission rather than for breach of contract. Defendants' failure to file a pleading in response to the amended complaint was in technical violation of Federal Rule of Civil Procedure 15(a), which states in pertinent part that a "party shall plead in response to an amended pleading ... within 10 days after service of the amended pleading ... unless the court otherwise orders." During the trial, defendants did move to refile their original answer and counterclaim in response to the amended complaint. Plaintiff can show no prejudice to himself if this should be granted, as the counterclaim would obviously raise no new issues, and plaintiff has been on notice of the issues raised by the original counterclaim since it was first filed. The court accordingly exercises its power under Rule 15(a), and grants defendants' motion to refile the original answer and counterclaim as defendants' response to the amended complaint.

■ Defendants seek recovery of the license fees due under the contract for the sale of defendants' models. From the time plaintiff began making sales of these models in January, 1979 to August 22, 1979, the date the termination became effective, under the ninety day notice of the May 25, 1979 letter, defendants are clearly entitled to these fees, which under the evidence are in the amount of $6,507.15. An award of fees due after August 22, 1979, however, stands on a different footing.

■ Defendants testified at trial that once the contract was terminated, they never made *any* attempt to begin sales again

in the franchise area. Defendants made a vague claim, which was unsupported by factual examples, that it would have been impossible to make any sales in the area because plaintiff had "ruined" the franchise area. Yet, there is evidence of at least one substantial sale by defendants in the franchise area in 1980, *see* Exhibit 26, and plaintiff, producing defendants' models, continued to make sales.

Under the law of South Dakota, "a person whose business is damaged must exercise ordinary care to minimize existing damage and to prevent further damage. If any loss results from a failure to exercise such care, damages cannot be recovered for such loss." South Dakota Pattern Jury Instruction 33.02. This rule is of particular importance here. Defendants insist that plaintiff's version of their models was substandard and provoked complaints. If this were true, defendants should have been easily able to compete in the franchise area with plaintiff, particularly since plaintiff was no longer using defendants' name. Had defendants attempted to compete, defendants should clearly have been able to take many cap sales away from plaintiff, and thus receive the full amount of the sales price themselves rather than just two or three percent of the sales. Yet defendants did not do so; they made no attempt to reduce their losses in the franchise area. Instead, defendants seemingly chose to treat plaintiff as their *de facto* distributor, in spite of defendants' termination of their relationship, and now attempt to collect their two or three percent of the sales made by plaintiff's efforts. Defendants may not have it both ways. The court accordingly denies any recovery of fees after August 22, 1979.

■ Defendants also request an injunction to prevent plaintiff from producing any more of their models. The record shows that by the time of trial, defendants' business was no longer operating. While plaintiff was still producing caps during the time of trial, the court has been given to understand that plaintiff has also ceased production permanently. Any need for an injunction has therefore been mooted.

■ Judgment will therefore be entered for defendants on their counterclaim against plaintiff in the amount of $6,507.15. Defendants also ask prejudgment interest, to which they are entitled under SDCL 54–3–5. Under the circumstances of the procedural history of this case, however, the court will deny a complete award of interest from August, 1979 to the date of judgment. This action was originally scheduled for trial on October 4, 1982. Defendants' counsel reported a conflict, and in July, 1982, the parties moved for a continuance. The trial was rescheduled for February 14, 1983, but immediately prior to that date, attorney for defendants indicated that settlement was near, and the court authorized a further continuance. Where, as here, there are repeated delays in the start of trial, caused at least in part by the party seeking the award of prejudgment interest, interest will be denied for the period of the delay. *Safeco Insurance Co. v. City of Watertown*, 538 F.Supp. 49, 52 (D.S.D. 1982). Thus, no interest will be allowed between October 4, 1982, when the case was originally scheduled for trial, and September 13, 1983, when it actually was tried.[11] Thus, the award of prejudgment interest shall be in the amount of $3,871.61.

The clerk shall enter judgment accordingly.

This opinion constitutes this court's findings of fact and conclusions of law.

11. The final disposition of this case has been delayed by the extreme complexity of the facts and because no transcript was available until July, 1984.